## BELL ET AL. *v.* MARYLAND.

No. 12.   Argued October 14–15, 1963.—Decided June 22, 1964.

*Jack Greenberg* argued the cause for petitioners. With him on the brief were *Constance Baker Motley, James M. Nabrit III, Charles L. Black, Jr., Juanita Jackson Mitchell, Tucker R. Dearing, Matthew J. Perry, Lincoln C. Jenkins, Derrick A. Bell, Jr., William T. Coleman, Jr., Louis H. Pollak, Richard R. Powell, Joseph L. Rauh, Jr.* and *John Silard.*

*Loring E. Hawes* and *Russell R. Reno, Jr.,* Assistant Attorneys General of Maryland, argued the cause for respondent. With Mr. *Hawes* on the brief were *Thomas B. Finan,* Attorney General of Maryland, and *Robert C. Murphy,* Deputy Attorney General.

*Ralph S. Spritzer,* by special leave of Court, argued the cause for the United States, as *amicus curiae,* urging reversal. With him on the briefs were *Solicitor General Cox, Assistant Attorney General Marshall, Louis F. Claiborne, Harold H. Greene, Howard A. Glickstein* and *David Rubin.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Petitioners, 12 Negro students, were convicted in a Maryland state court as a result of their participation in a "sit-in" demonstration at Hooper's restaurant in the City of Baltimore in 1960. The convictions were based on a record showing in summary that a group of 15 to 20 Negro students, including petitioners, went to Hooper's restaurant to engage in what their counsel describes as a "sit-in protest" because the restaurant would not serve Negroes. The "hostess," on orders of Mr. Hooper, the president of the corporation owning the restaurant, told them, "solely on the basis of their color," that they would

not be served.   Petitioners did not leave when requested to by the hostess and the manager; instead they went to tables, took seats, and refused to leave, insisting that they be served.   On orders of Mr. Hooper the police were called, but they advised that a warrant would be necessary before they could arrest petitioners.   Mr. Hooper then went to the police station and swore out warrants, and petitioners were accordingly arrested.

The statute under which the convictions were obtained was the Maryland criminal trespass law, § 577 of Art. 27 of the Maryland Code, 1957 edition, under which it is a misdemeanor to "enter upon or cross over the land, premises or private property of any person or persons in this State after having been duly notified by the owner or his agent not to do so."   The convictions were affirmed by the Maryland Court of Appeals, 227 Md. 302, 176 A. 2d 771 (1962), and we granted certiorari.   374 U. S. 805.

We do not reach the questions that have been argued under the Equal Protection and Due Process Clauses of the Fourteenth Amendment.   It appears that a significant change has taken place in the applicable law of Maryland since these convictions were affirmed by the Court of Appeals.   Under this Court's settled practice in such circumstances, the judgments must consequently be vacated and reversed and the case remanded so that the state court may consider the effect of the supervening change in state law.

Petitioners' convictions were affirmed by the Maryland Court of Appeals on January 9, 1962.   Since that date, Maryland has enacted laws that abolish the crime of which petitioners were convicted.   These laws accord petitioners a right to be served in Hooper's restaurant, and make unlawful conduct like that of Hooper's president and hostess in refusing them service because of their race.   On June 8, 1962, the City of Baltimore enacted its Ordinance No. 1249, adding § 10A to Art. 14A of the

Baltimore City Code (1950 ed.). The ordinance, which by its terms took effect from the date of its enactment, prohibits owners and operators of Baltimore places of public accommodation, including restaurants, from denying their services or facilities to any person because of his race. A similar "public accommodations law," applicable to Baltimore City and Baltimore County though not to some of the State's other counties, was adopted by the State Legislature on March 29, 1963. Art. 49B Md. Code § 11 (1963 Supp.). This statute went into effect on June 1, 1963, as provided by § 4 of the Act, Acts 1963, c. 227. The statute provides that:

"It is unlawful for an owner or operator of a place of public accommodation or an agent or employee of said owner or operator, because of the race, creed, color, or national origin of any person, to refuse, withhold from, or deny to such person any of the accommodations, advantages, facilities and privileges of such place of public accommodation. For the purpose of this subtitle, a place of public accommodation means any hotel, restaurant, inn, motel or an establishment commonly known or recognized as regularly engaged in the business of providing sleeping accommodations, or serving food, or both, for a consideration, and which is open to the general public . . . ."[1]

---

[1] Another public accommodations law was enacted by the Maryland Legislature on March 14, 1964, and signed by the Governor on April 7, 1964. This statute re-enacts the quoted provision from the 1963 enactment and gives it statewide application, eliminating the county exclusions. The new statute was scheduled to go into effect on June 1, 1964, but its operation has apparently been suspended by the filing of petitions seeking a referendum. See Md. Const., Art. XVI; Baltimore Sun, May 31, 1964, p. 22, col. 1. Meanwhile, the Baltimore City ordinance and the 1963 state law, both of which are applicable to Baltimore City, where Hooper's restaurant is located, remain in effect.

It is clear from these enactments that petitioners' conduct in entering or crossing over the premises of Hooper's restaurant after being notified not to do so because of their race would not be a crime today; on the contrary, the law of Baltimore and of Maryland now vindicates their conduct and recognizes it as the exercise of a right, directing the law's prohibition not at them but at the restaurant owner or manager who seeks to deny them service because of their race.

An examination of Maryland decisions indicates that under the common law of Maryland, the supervening enactment of these statutes abolishing the crime for which petitioners were convicted would cause the Maryland Court of Appeals at this time to reverse the convictions and order the indictments dismissed. For Maryland follows the universal common-law rule that when the legislature repeals a criminal statute or otherwise removes the State's condemnation from conduct that was formerly deemed criminal, this action requires the dismissal of a pending criminal proceeding charging such conduct. The rule applies to any such proceeding which, at the time of the supervening legislation, has not yet reached final disposition in the highest court authorized to review it. Thus, in *Keller* v. *State*, 12 Md. 322 (1858), the statute under which the appellant had been indicted and convicted was repealed by the legislature after the case had been argued on appeal in the Court of Appeals but before that court's decision, although the repeal was not brought to the notice of the court until after the judgment of affirmance had been announced. The appellant's subsequent motion to correct the judgment was granted, and the judgment was reversed. The court explained, *id.*, at 325–327:

"It is well settled, that a party cannot be convicted, after the law under which he may be prosecuted has been repealed, although the offence may have been

committed before the repeal. . . . The same principle applies where the law is repealed, or expires pending an appeal on a writ of error from the judgment of an inferior court. . . . The judgment in a criminal cause cannot be considered as final and conclusive to every intent, notwithstanding the removal of the record to a superior court. If this were so, there would be no use in taking the appeal or suing out a writ of error. . . . And so if the law be repealed, pending the appeal or writ of error, the judgment will be reversed, because the decision must be in accordance with the law at the time of final judgment."

The rule has since been reaffirmed by the Maryland court on a number of occasions. *Beard* v. *State,* 74 Md. 130, 135, 21 A. 700, 702 (1891); *Smith* v. *State,* 45 Md. 49 (1876); *State* v. *Gambrill,* 115 Md. 506, 513, 81 A. 10, 12 (1911); *State* v. *Clifton,* 177 Md. 572, 574, 10 A. 2d 703, 704 (1940).[2]

---

[2] The rule has also been consistently recognized and applied by this Court. Thus in *United States* v. *Schooner Peggy,* 1 Cranch 103, 110, Chief Justice Marshall held:

"It is in the general true that the province of an appellate court is only to enquire whether a judgment when rendered was erroneous or not. But if subsequent to the judgment and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied. If the law be constitutional, . . . I know of no court which can contest its obligation. . . . In such a case the court must decide according to existing laws, and if it be necessary to set aside a judgment, rightful when rendered, but which cannot be affirmed but in violation of law, the judgment must be set aside."

See also *Yeaton* v. *United States,* 5 Cranch 281, 283; *Maryland* v. *Baltimore & O. R. Co.,* 3 How. 534, 552; *United States* v. *Tynen,* 11 Wall. 88, 95; *United States* v. *Reisinger,* 128 U. S. 398, 401; *United States* v. *Chambers,* 291 U. S. 217, 222–223; *Massey* v. *United States,* 291 U. S. 608.

It is true that the present case is factually distinguishable, since here the legislative abolition of the crime for which petitioners were convicted occurred after rather than before the decision of the Maryland Court of Appeals. But that fact would seem irrelevant. For the purpose of applying the rule of the Maryland common law, it appears that the only question is whether the legislature acts before the affirmance of the conviction becomes final. In the present case the judgment is not yet final, for it is on direct review in this Court. This would thus seem to be a case where, as in *Keller,* the change of law has occurred "pending an appeal on a writ of error from the judgment of an inferior court," and hence where the Maryland Court of Appeals upon remand from this Court would render its decision "in accordance with the law at the time of final judgment." It thus seems that the Maryland Court of Appeals would take account of the supervening enactment of the city and state public accommodations laws and, applying the principle that a statutory offense which has "ceased to exist is no longer punishable at all," *Beard* v. *State, supra,* 74 Md. 130, 135, 21 A. 700, 702 (1891), would now reverse petitioners' convictions and order their indictments dismissed.

The Maryland common law is not, however, the only Maryland law that is relevant to the question of the effect of the supervening enactments upon these convictions. Maryland has a general saving clause statute which in certain circumstances "saves" state convictions from the common-law effect of supervening enactments. It is thus necessary to consider the impact of that clause upon the present situation. The clause, Art. 1 Md. Code § 3 (1957), reads as follows:

> "The repeal, or the repeal and re-enactment, or the revision, amendment or consolidation of any statute, or of any section or part of a section of any statute,

civil or criminal, shall not have the effect to release, extinguish, alter, modify or change, in whole or in part, any penalty, forfeiture or liability, either civil or criminal, which shall have been incurred under such statute, section or part thereof, unless the re-pealing, repealing and re-enacting, revising, amend-ing or consolidating act shall expressly so provide; and such statute, section or part thereof, so repealed, repealed and re-enacted, revised, amended or consoli-dated, shall be treated and held as still remaining in force for the purpose of sustaining any and all proper actions, suits, proceedings or prosecutions, civil or criminal, for the enforcement of such penalty, for-feiture or liability, as well as for the purpose of sus-taining any judgment, decree or order which can or may be rendered, entered or made in such actions, suits, proceedings or prosecutions imposing, inflict-ing or declaring such penalty, forfeiture or liability."

Upon examination of this clause and of the relevant state case law and policy considerations, we are far from persuaded that the Maryland Court of Appeals would hold the clause to be applicable to save these convic-tions. By its terms, the clause does not appear to be applicable at all to the present situation. It applies only to the "repeal," "repeal and re-enactment," "revision," "amendment," or "consolidation" of any statute or part thereof. The effect wrought upon the criminal trespass statute by the supervening public accommodations laws would seem to be properly described by none of these terms. The only two that could even arguably apply are "repeal" and "amendment." But neither the city nor the state public accommodations enactment gives the slightest indication that the legislature considered itself to be "repealing" or "amending" the trespass law. Nei-ther enactment refers in any way to the trespass law, as is characteristically done when a prior statute is being

repealed or amended.[3]   This fact alone raises a substantial possibility that the saving clause would be held inapplicable, for the clause might be narrowly construed—especially since it is in derogation of the common law and since this is a criminal case—as requiring that a "repeal" or "amendment" be designated as such in the supervening statute itself.[4]

The absence of such terms from the public accommodations laws becomes more significant when it is recognized that the effect of these enactments upon the trespass statute was quite different from that of an "amendment"

---

[3] Thus the statewide public accommodations law enacted in 1964, see note 1, *supra*, is entitled "An Act to repeal and re-enact, with amendments . . . ," the 1963 Act, and provides expressly at several points that certain portions of the 1963 Act—none of which is here relevant—are "hereby repealed."   But the 1964 enactment, like the 1963 enactment and the Baltimore City ordinance, contains no reference whatever to the trespass law, much less a statement that that law is being in any respect "repealed" or "amended."

[4] The Maryland case law under the saving clause is meager and sheds little if any light on the present question.   The clause has been construed only twice since its enactment in 1912, and neither case seems directly relevant here.   *State* v. *Clifton*, 177 Md. 572, 10 A. 2d 703 (1940); *State* v. *Kennerly*, 204 Md. 412, 104 A. 2d 632 (1954). In two other cases, the clause was ignored.   *State* v. *American Bonding Co.*, 128 Md. 268, 97 A. 529 (1916); *Green* v. *State*, 170 Md. 134, 183 A. 526 (1936).   The failure to apply the clause in these cases was explained by the Court of Appeals in the *Clifton* case, *supra*, 177 Md., at 576–577, 10 A. 2d, at 705, on the basis that "in neither of those proceedings did it appear that any penalty, forfeiture, or liability had actually been incurred."   This may indicate a narrow construction of the clause, since the language of the clause would seem to have applied to both cases.   Also indicative of a narrow construction is the statement of the Court of Appeals in the *Kennerly* case, *supra*, that the saving clause is "merely an aid to interpretation, stating the general rule against repeals by implication in more specific form."   204 Md., at 417, 104 A. 2d, at 634.   Thus, if the case law has any pertinence, it supports a narrow construction of the saving clause and hence a conclusion that the clause is inapplicable here.

or even a "repeal" in the usual sense. These enactments do not—in the manner of an ordinary "repeal," even one that is substantive rather than only formal or technical— merely erase the criminal liability that had formerly attached to persons who entered or crossed over the premises of a restaurant after being notified not to because of their race; they go further and confer upon such persons an affirmative right to carry on such conduct, making it unlawful for the restaurant owner or proprietor to notify them to leave because of their race. Such a substitution of a right for a crime, and vice versa, is a possibly unique phenomenon in legislation; it thus might well be construed as falling outside the routine categories of "amendment" and "repeal."

Cogent state policy considerations would seem to support such a view. The legislative policy embodied in the supervening enactments here would appear to be much more strongly opposed to that embodied in the old enactment than is usually true in the case of an "amendment" or "repeal." It would consequently seem unlikely that the legislature intended the saving clause to apply in this situation, where the result of its application would be the conviction and punishment of persons whose "crime" has been not only erased from the statute books but officially vindicated by the new enactments. A legislature that passed a public accommodations law making it unlawful to deny service on account of race probably did not desire that persons should still be prosecuted and punished for the "crime" of seeking service from a place of public accommodations which denies it on account of race. Since the language of the saving clause raises no barrier to a ruling in accordance with these policy considerations, we should hesitate long indeed before concluding that the Maryland Court of Appeals would definitely hold the saving clause applicable to save these convictions.

Moreover, even if the word "repeal" or "amendment" were deemed to make the saving clause prima facie applicable, that would not be the end of the matter. There would remain a substantial possibility that the public accommodations laws would be construed as falling within the clause's exception: "unless the repealing . . . act shall expressly so provide." Not only do the policy considerations noted above support such an interpretation, but the operative language of the state public accommodations enactment affords a solid basis for a finding that it does "expressly so provide" within the terms of the saving clause. Whereas most criminal statutes speak in the future tense—see, for example, the trespass statute here involved, Art. 27 Md. Code § 577: "Any person or persons who *shall* enter upon or cross over . . ."—the state enactment here speaks in the present tense, providing that "it *is* unlawful for an owner or operator . . . ." In this very context, the Maryland Court of Appeals has given effect to the difference between the future and present tense. In *Beard* v. *State, supra,* 74 Md. 130, 21 A. 700, the court, in holding that a supervening statute did not implicitly repeal the former law and thus did not require dismissal of the defendant's conviction under that law, relied on the fact that the new statute used the word "shall" rather than the word "is." From this the court concluded that "The obvious intention of the Legislature in passing it was, not to interfere with *past* offences, but merely to fix a penalty for *future* ones." 74 Md., at 133, 21 A., at 701. Conversely here, the use of the present instead of the more usual future tense may very possibly be held by the Court of Appeals, especially in view of the policy considerations involved, to constitute an "express provision" by the legislature, within the terms of the saving clause, that it did intend its new enactment to apply to past as well as future conduct—that it did not intend the saving clause to be applied, in derogation of

the common-law rule, so as to permit the continued prosecution and punishment of persons accused of a "crime" which the legislature has now declared to be a right.

As a matter of Maryland law, then, the arguments supporting a conclusion that the saving clause would not apply to save these convictions seem quite substantial. It is not for us, however, to decide this question of Maryland law, or to reach a conclusion as to how the Maryland Court of Appeals would decide it. Such a course would be inconsistent with our tradition of deference to state courts on questions of state law. Nor is it for us to ignore the supervening change in state law and proceed to decide the federal constitutional questions presented by this case. To do so would be to decide questions which, because of the possibility that the state court would now reverse the convictions, are not necessarily presented for decision. Such a course would be inconsistent with our constitutional inability to render advisory opinions, and with our consequent policy of refusing to decide a federal question in a case that might be controlled by a state ground of decision. See *Murdock* v. *Memphis,* 20 Wall. 590, 634–636. To avoid these pitfalls—to let issues of state law be decided by state courts and to preserve our policy of avoiding gratuitous decisions of federal questions—we have long followed a uniform practice where a supervening event raises a question of state law pertaining to a case pending on review here. That practice is to vacate and reverse the judgment and remand the case to the state court, so that it may reconsider it in the light of the supervening change in state law.

The rule was authoritatively stated and applied in *Missouri ex rel. Wabash R. Co.* v. *Public Service Comm'n,* 273 U. S. 126, a case where the supervening event was—as it is here—enactment of new state legislation asserted to change the law under which the case had been decided

by the highest state court. Speaking for the Court, Mr. Justice Stone said:

"Ordinarily this Court on writ of error to a state court considers only federal questions and does not review questions of state law. But where questions of state law arising after the decision below are presented here, our appellate powers are not thus restricted. Either because new facts have supervened since the judgment below, or because of a change in the law, this Court, in the exercise of its appellate jurisdiction, may consider the state questions thus arising and either decide them or remand the cause for appropriate action by the state courts. The meaning and effect of the state statute now in question are primarily for the determination of the state court. While this Court may decide these questions, it is not obliged to do so, and in view of their nature, we deem it appropriate to refer the determination to the state court. In order that the state court may be free to consider the question and make proper disposition of it, the judgment below should be set aside, since a dismissal of this appeal might leave the judgment to be enforced as rendered. The judgment is accordingly reversed and the cause remanded for further proceedings." (Citations omitted.) 273 U. S., at 131.

Similarly, in *Patterson* v. *Alabama*, 294 U. S. 600, Mr. Chief Justice Hughes stated the rule as follows:

"We have frequently held that in the exercise of our appellate jurisdiction we have power not only to correct error in the judgment under review but to make such disposition of the case as justice requires. And in determining what justice does require, the Court is bound to consider any change, either in fact

or in law, which has supervened since the judgment was entered. We may recognize such a change, which may affect the result, by setting aside the judgment and remanding the case so that the state court may be free to act. We have said that to do this is not to review, in any proper sense of the term, the decision of the state court upon a non-federal question, but only to deal appropriately with a matter arising since its judgment and having a bearing upon the right disposition of the case." 294 U. S., at 607.

For other cases applying the rule, see *Gulf, C. & S. F. R. Co.* v. *Dennis,* 224 U. S. 503, 505–507; *Dorchy* v. *Kansas,* 264 U. S. 286, 289; *Ashcraft* v. *Tennessee,* 322 U. S. 143, 155–156.[5]

The question of Maryland law raised here by the supervening enactment of the city and state public accommodations laws clearly falls within the rule requiring us to vacate and reverse the judgment and remand the case to the Maryland Court of Appeals. Indeed, we have followed this course in other situations involving a state saving clause or similar provision, where it was considerably more probable than it is here that the State would desire its judgment to stand despite the supervening change of law. In *Roth* v. *Delano,* 338 U. S. 226, the Court vacated and remanded the judgment in light of the State's supervening repeal of the applicable statute despite the presence in the repealer of a saving clause which, unlike the one here, was clearly applicable in terms. In *Dorchy* v. *Kansas, supra,* 264 U. S. 286, the supervening event was a holding by this Court that an-

---

[5] See also *Metzger Motor Car Co.* v. *Parrott,* 233 U. S. 36; *New York ex rel. Whitman* v. *Wilson,* 318 U. S. 688; *State Tax Comm'n* v. *Van Cott,* 306 U. S. 511; *Roth* v. *Delano,* 338 U. S. 226, 231; *Williams* v. *Georgia,* 349 U. S. 375, 390–391; *Trunkline Gas Co.* v. *Hardin County,* 375 U. S. 8.

other portion of the same state statute was unconstitutional, and the question was whether Dorchy's conviction could stand nevertheless. The state statute had a severability provision which seemingly answered the question conclusively, providing that "If any section or provision of this act shall be found invalid by any court, it shall be conclusively presumed that this act would have been passed by the legislature without such invalid section or provision . . . ." Nevertheless, a unanimous Court vacated and reversed the judgment and remanded the case, so that the question could be decided by the state court. Mr. Justice Brandeis said, 264 U. S., at 290–291:

> "Whether § 19 [the criminal provision under which Dorchy stood convicted] is so interwoven with the system held invalid that the section cannot stand alone, is a question of interpretation and of legislative intent. . . . Section 28 of the act [the severability clause] . . . provides a rule of construction which may sometimes aid in determining that intent. But it is an aid merely; not an inexorable command.
>
> "The task of determining the intention of the state legislature in this respect, like the usual function of interpreting a state statute, rests primarily upon the state court. Its decision as to the severability of a provision is conclusive upon this Court. . . . In cases coming from the state courts, this Court, in the absence of a controlling state decision, may, in passing upon the claim under the federal law, decide, also, the question of severability. But it is not obliged to do so. The situation may be such as to make it appropriate to leave the determination of the question to the state court. We think that course should be followed in this case.
>
> ". . . In order that the state court may pass upon this question, its judgment in this case, which was

rendered before our decision in [the other case], should be vacated. . . . To this end the judgment is

*"Reversed."*

Except for the immaterial fact that a severability clause rather than a saving clause was involved, the holding and the operative language of the *Dorchy* case are precisely in point here. Indeed, the need to set aside the judgment and remand the case is even more compelling here, since the Maryland saving clause is not literally applicable to the public accommodations laws and since state policy considerations strengthen the inference that it will be held inapplicable. Here, as in *Dorchy,* the applicability of the clause to save the conviction "is a question of interpretation and of legislative intent," and hence it is "appropriate to leave the determination of the question to the state court." Even if the Maryland saving clause were literally applicable, the fact would remain that, as in *Dorchy,* the clause "provides a rule of construction which may sometimes aid in determining that intent. But it is an aid merely; not an inexorable command." The Maryland Court of Appeals has stated that the Maryland saving clause is likewise "merely an aid to interpretation." *State* v. *Kennerly,* note 4, *supra,* 204 Md., at 417, 104 A. 2d, at 634.

In short, this case involves not only a question of state law but an open and arguable one. This Court thus has a "duty to recognize the changed situation," *Gulf, C. & S. F. R. Co.* v. *Dennis, supra,* 224 U. S., at 507, and, by vacating and reversing the judgment and remanding the case, to give effect to the principle that "the meaning and effect of the state statute now in question are primarily for the determination of the state court." *Missouri ex rel. Wabash R. Co.* v. *Public Service Comm'n, supra,* 273 U. S., at 131.

Accordingly, the judgment of the Maryland Court of Appeals should be vacated and the case remanded to that court, and to this end the judgment is

*Reversed and remanded.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE GOLDBERG concurs as respects Parts II–V, for reversing and directing dismissal of the indictment.

## I.

I reach the merits of this controversy. The issue is ripe for decision and petitioners, who have been convicted of asking for service in Hooper's restaurant, are entitled to an answer to their complaint here and now.

On this the last day of the Term, we studiously avoid decision of the basic issue of the right of public accommodation under the Fourteenth Amendment, remanding the case to the state court for reconsideration in light of an issue of state law.

This case was argued October 14 and 15, 1963—over eight months ago. The record of the case is simple, the constitutional guidelines well marked, the precedents marshalled. Though the Court is divided, the preparation of opinions laying bare the differences does not require even two months, let alone eight. Moreover, a majority reach the merits of the issue. Why then should a minority prevent a resolution of the differing views?

The laws relied on for vacating and remanding were enacted June 8, 1962, and March 29, 1963—long before oral argument. We did indeed not grant certiorari until June 10, 1963. Hence if we were really concerned with this state law question, we would have vacated and remanded for reconsideration in light of those laws on June 10, 1963. By now we would have had an answer and been able to put our decision into the mainstream of the law at this critical hour. If the parties had been con-

cerned, they too might have asked that we follow that course. Maryland adverted to the new law merely to show why certiorari should not be granted. At the argument and at our conferences we were not concerned with that question, the issue being deemed frivolous. Now it is resurrected to avoid facing the constitutional question.

The whole Nation has to face the issue; Congress is conscientiously considering it; some municipalities have had to make it their first order of concern; law enforcement officials are deeply implicated, North as well as South; the question is at the root of demonstrations, unrest, riots, and violence in various areas. The issue in other words consumes the public attention. Yet we stand mute, avoiding decision of the basic issue by an obvious pretense.

The clash between Negro customers and white restaurant owners is clear; each group claims protection by the Constitution and tenders the Fourteenth Amendment as justification for its action. Yet we leave resolution of the conflict to others, when, if our voice were heard, the issues for the Congress and for the public would become clear and precise. The Court was created to sit in troubled times as well as in peaceful days.

There is a school of thought that our adjudication of a constitutional issue should be delayed and postponed as long as possible. That school has had many stout defenders and ingenious means have at times been used to avoid constitutional pronouncements. Yet judge-made rules, fashioned to avoid decision of constitutional questions, largely forget what Chief Justice Marshall wrote in *Fletcher* v. *Peck,* 6 Cranch 87, 137–138:

"Whatever respect might have been felt for the state sovereignties, it is not to be disguised that the framers of the constitution viewed, with some apprehension, the violent acts which might grow out of the feelings of the moment; and that the people of the

United States, in adopting that instrument, have manifested a determination to shield themselves and their property from the effects of those sudden and strong passions to which men are exposed. The restrictions on the legislative power of the states are obviously founded in this sentiment; and the constitution of the United States contains what may be deemed a bill of rights for the people of each state."

Much of our history has shown that what Marshall said of the encroachment of legislative power on the rights of the people is true also of the encroachment of the judicial branch, as where state courts use unconstitutional procedures to convict people or make criminal what is beyond the reach of the States.   I think our approach here should be that of Marshall in *Marbury* v. *Madison,* 1 Cranch 137, 177–178, where the Court spoke with authority though there was an obviously easy way to avoid saying anything:

"It is emphatically the province and duty of the judicial department to say what the law is.   Those who apply the rule to particular cases, must of necessity expound and interpret that rule.   If two laws conflict with each other, the courts must decide on the operation of each.

"So if a law be in opposition to the constitution; if both the law and the constitution apply to a particular case, so that the court must either decide that case conformably to the law, disregarding the constitution; or conformably to the constitution, disregarding the law; the court must determine which of these conflicting rules governs the case.   This is of the very essence of judicial duty."

We have in this case a question that is basic to our way of life and fundamental in our constitutional scheme. No question preoccupies the country more than this one;

it is plainly justiciable; it presses for a decision one way or another; we should resolve it. The people should know that when filibusters occupy other forums, when oppressions are great, when the clash of authority between the individual and the State is severe, they can still get justice in the courts. When we default, as we do today, the prestige of law in the life of the Nation is weakened.

For these reasons I reach the merits; and I vote to reverse the judgments of conviction outright.

## II.

The issue in this case, according to those who would affirm, is whether a person's "personal prejudices" may dictate the way in which he uses his property and whether he can enlist the aid of the State to enforce those "personal prejudices." With all respect, that is not the real issue. The corporation that owns this restaurant did not refuse service to these Negroes because "it" did not like Negroes. The reason "it" refused service was because "it" thought "it" could make more money by running a segregated restaurant.

In the instant case, G. Carroll Hooper, president of the corporate chain owning the restaurant here involved, testified concerning the episode that gave rise to these convictions. The reasons were wholly commercial ones:

> "I set at the table with him and two other people and reasoned and talked to him why my policy was not yet one of integration and told him that I had two hundred employees and half of them were colored. I thought as much of them as I did the white employees. I invited them back in my kitchen if they'd like to go back and talk to them. *I wanted to prove to them it wasn't my policy, my personal prejudice,* we were not, that I had valuable colored employees and I thought just as much of them. I

tried to reason with these leaders, told them that *as long as my customers were the deciding who they want to eat with, I'm at the mercy of my customers. I'm trying to do what they want. If they fail to come in, these people are not paying my expenses, and my bills.* They didn't want to go back and talk to my colored employees because every one of them are in sympathy with me and that is we're in sympathy with what their objectives are, with what they are trying to abolish . . . ." (Italics added.)

Here, as in most of the sit-in cases before us, the refusal of service did not reflect "personal prejudices" but business reasons.[1] Were we today to hold that segregated restaurants, whose racial policies were enforced by a State, violated the Equal Protection Clause, all restaurants would be on an equal footing and the reasons given in this and most of the companion cases for refusing service to Negroes would evaporate. Moreover, when corporate restaurateurs are involved, whose "personal prejudices" are being protected? The stockholders'? The directors'? The officers'? The managers'? The truth is, I think, that the corporate interest is in making money, not in protecting "personal prejudices."

## III.

I leave those questions to another part of this opinion [2] and turn to an even more basic issue.

I now assume that the issue is the one stated by those who would affirm. The case in that posture deals with a relic of slavery—an institution that has cast a long shadow across the land, resulting today in a second-class citizenship in this area of public accommodations.

---

[1] See Appendix II.

[2] See Appendix I.

The Thirteenth, Fourteenth, and Fifteenth Amendments had "one pervading purpose . . . we mean the freedom of the slave race, the security and firm establishment of that freedom, and the protection of the newly-made freeman and citizen from the oppressions of those who had formerly exercised unlimited dominion over him." *Slaughter-House Cases,* 16 Wall. 36, 71.

Prior to those Amendments, Negroes were segregated and disallowed the use of public accommodations except and unless the owners chose to serve them. To affirm these judgments would remit those Negroes to their old status and allow the States to keep them there by the force of their police and their judiciary.

We deal here with public accommodations—with the right of people to eat and travel as they like and to use facilities whose only claim to existence is serving the public. What the President said in his State of the Union Message on January 8, 1964, states the constitutional right of all Americans, regardless of race or color, to be treated equally by all branches of government:

"Today Americans of all races stand side by side in Berlin and in Vietnam.

"They died side by side in Korea.

"Surely they can work and eat and travel side by side in their own country."

The Black Codes were a substitute for slavery; segregation was a substitute for the Black Codes; [3]

---

[3] For accounts of the Black Codes see Fleming, The Sequel of Appomattox (1919), pp. 94–98; Sen. Ex. Doc. No. 6, 39th Cong., 2d Sess.; I Oberholtzer, A History of the United States Since the Civil War (1917), pp. 126–127, 136–137, 175. They are summarized as follows by Morison and Commager, The Growth of the American Republic (1950), pp. 17–18:

"These black codes provided for relationships between the whites and the blacks in harmony with realities—as the whites understood them—rather than with abstract theory. They conferred upon the

the discrimination in these sit-in cases is a relic of slavery.[4]

The Fourteenth Amendment says "No State shall make or enforce any law which shall abridge the privileges or

freedmen fairly extensive privileges, gave them the essential rights of citizens to contract, sue and be sued, own and inherit property, and testify in court, and made some provision for education. In no instance were the freedmen accorded the vote or made eligible for juries, and for the most part they were not permitted to testify against white men. Because of their alleged aversion to steady work they were required to have some steady occupation, and subjected to special penalties for violation of labor contracts. Vagrancy and apprenticeship laws were especially harsh, and lent themselves readily to the establishment of a system of peonage. The penal codes provided harsher and more arbitrary punishments for blacks than for whites, and some states permitted individual masters to administer corporal punishment to 'refractory servants.' Negroes were not allowed to bear arms or to appear in all public places, and there were special laws governing the domestic relations of the blacks. In some states laws closing to the freedmen every occupation save domestic and agricultural service, betrayed a poor-white jealousy of the Negro artisan. Most codes, however, included special provisions to protect the Negro from undue exploitation and swindling. On the whole the black codes corresponded fairly closely to the essential fact that nearly four million ex-slaves needed special attention until they were ready to mingle in free society on more equal terms. But in such states as South Carolina and Mississippi there was clearly evident a desire to keep the freedmen in a permanent position of tutelage, if not of peonage."

[4] Other "relics of slavery" have recently come before this Court. In *Hamilton* v. *Alabama*, 376 U. S. 650, we reversed a judgment of contempt imposed on a Negro witness under these circumstances:

"Cross examination by Solicitor Rayburn:

"Q. What is your name, please?

"A. Miss Mary Hamilton.

"Q. Mary, I believe—you were arrested—who were you arrested by?

"A. My name is Miss Hamilton. Please address me correctly.

"Q. Who were you arrested by, Mary?

"A. I will not answer a question—

immunities of citizens of the United States." The Fourteenth Amendment also makes every person who is born here a citizen; and there is no second or third or fourth class of citizenship. See, e. g., *Schneider* v. *Rusk,* 377 U. S. 163, 168.

We deal here with incidents of national citizenship. As stated in the *Slaughter-House Cases,* 16 Wall. 36, 71–72, concerning the *federal rights* resting on the Thirteenth, Fourteenth, and Fifteenth Amendments:

> ". . . no one can fail to be impressed with the one pervading purpose found in them all, lying at the foundation of each, and without which none of them would have been even suggested; we mean the freedom of the slave race, the security and firm establishment of that freedom, and the protection of the newly-made freeman and citizen from the oppressions of those who had formerly exercised unlimited dominion over him. It is true that only the fifteenth amendment, in terms, mentions the negro by speaking of his color and his slavery. But it is just as true that each of the other articles was addressed to the grievances of that race, and designed to remedy them as the fifteenth."

---

"By Attorney Amaker: The witness's name is Miss Hamilton.

"A. —your question until I am addressed correctly.

"The Court: Answer the question.

"The Witness: I will not answer them unless I am addressed correctly.

"The Court: You are in contempt of court—

"Attorney Conley: Your Honor—your Honor—

"The Court: You are in contempt of this court, and you are sentenced to five days in jail and a fifty dollar fine."

Additional relics of slavery are mirrored in recent decisions: *Brown* v. *Board of Education,* 347 U. S. 483 (segregated schools); *Johnson* v. *Virginia,* 373 U. S. 61 (segregated courtroom); *Peterson* v. *Greenville,* 373 U. S. 244, and *Lombard* v. *Louisiana,* 373 U. S. 267 (segregated restaurants); *Wright* v. *Georgia,* 373 U. S. 284, and *Watson* v. *Memphis,* 373 U. S. 526 (segregated public parks).

When we deal with Amendments touching the liberation of people from slavery, we deal with rights "which owe their existence to the Federal government, its National character, its Constitution, or its laws." *Id.,* at 79. We are not in the field of exclusive municipal regulation where federal intrusion might "fetter and degrade the State governments by subjecting them to the control of Congress, in the exercise of powers heretofore universally conceded to them of the most ordinary and fundamental character." *Id.,* at 78.

There has been a judicial reluctance to expand the content of national citizenship beyond racial discrimination, voting rights, the right to travel, safe custody in the hands of a federal marshal, diplomatic protection abroad, and the like. See *Slaughter-House Cases, supra; Logan* v. *United States,* 144 U. S. 263; *United States* v. *Classic,* 313 U. S. 299; *Edwards* v. *California,* 314 U. S. 160; *Kent* v. *Dulles,* 357 U. S. 116. The reluctance has been due to a fear of creating constitutional refuges for a host of rights historically subject to regulation. See *Madden* v. *Kentucky,* 309 U. S. 83, overruling *Colgate* v. *Harvey,* 296 U. S. 404. But those fears have no relevance here, where we deal with Amendments whose dominant purpose was to guarantee the freedom of the slave race and establish a regime where national citizenship has only one class.

The manner in which the right to be served in places of public accommodations is an incident of national citizenship and of the right to travel is summarized in H. R. Rep. No. 914, Pt. 2, 88th Cong., 1st Sess., pp. 7–8:

> "An official of the National Association for the Advancement of Colored People, testified before the Senate Commerce Subcommittee as follows:
>
> " 'For millions of Americans this is vacation time. Swarms of families load their automobiles and trek across country. I invite the members of this com-

mittee to imagine themselves darker in color and to plan an auto trip from Norfolk, Va., to the gulf coast of Mississippi, say, to Biloxi. Or one from Terre Haute, Ind., to Charleston, S. C., or from Jacksonville, Fla., to Tyler, Tex.

" 'How far do you drive each day? Where and under what conditions can you and your family eat? Where can they use a rest room? Can you stop driving after a reasonable day behind the wheel or must you drive until you reach a city where relatives or friends will accommodate you and yours for the night? Will your children be denied a soft drink or an ice cream cone because they are not white?'

"In response to Senator Pastore's question as to what the Negro must do, there was the reply:

" 'Where you travel through what we might call hostile territory you take your chances. You drive and you drive and you drive. You don't stop where there is a vacancy sign out at a motel at 4 o'clock in the afternoon and rest yourself; you keep on driving until the next city or the next town where you know somebody or they know somebody who knows somebody who can take care of you.

" 'This is the way you plan it.

" 'Some of them don't go.'

"Daily we permit citizens of our Nation to be humiliated and subjected to hardship and abuse solely because of their color."

As stated in the first part of the same Report, p. 18:

"Today, more than 100 years after their formal emancipation, Negroes, who make up over 10 percent of our population, are by virtue of one or another type of discrimination not accorded the rights, privileges, and opportunities which are considered to be, and must be, the birthright of all citizens."

When one citizen because of his race, creed, or color is denied the privilege of being treated as any other citizen in places of public accommodation, we have classes of citizenship, one being more degrading than the other. That is at war with the one class of citizenship created by the Thirteenth, Fourteenth, and Fifteenth Amendments.

As stated in *Ex parte Virginia*, 100 U. S. 339, 344–345, where a federal indictment against a state judge for discriminating against Negroes in the selection of jurors was upheld:

> "One great purpose of these amendments was to raise the colored race from that condition of inferiority and servitude in which most of them had previously stood, into perfect equality of civil rights with all other persons within the jurisdiction of the States. They were intended to take away all possibility of oppression by law because of race or color. They were intended to be, what they really are, limitations of the power of the States and enlargements of the power of Congress."

## IV.

The problem in this case, and in the other sit-in cases before us, is presented as though it involved the situation of "a private operator conducting his own business on his own premises and exercising his own judgment" [5] as to whom he will admit to the premises.

The property involved is not, however, a man's home or his yard or even his fields. Private property is involved, but it is property that is serving the public. As my Brother GOLDBERG says, it is a "civil" right, not a "social" right, with which we deal. Here it is a restaurant refusing service to a Negro. But so far as principle and law are concerned it might just as well be a hospital re-

---

[5] Wright, The Sit-in Movement: Progress Report and Prognosis, 9 Wayne L. Rev. 445, 450 (1963).

fusing admission to a sick or injured Negro (cf. *Simkins v. Moses H. Cone Memorial Hospital*, 323 F. 2d 959), or a drugstore refusing antibiotics to a Negro, or a bus denying transportation to a Negro, or a telephone company refusing to install a telephone in a Negro's home.

The problem with which we deal has no relation to opening or closing the door of one's home. The home of course is the essence of privacy, in no way dedicated to public use, in no way extending an invitation to the public. Some businesses, like the classical country store where the owner lives overhead or in the rear, make the store an extension, so to speak, of the home. But such is not this case. The facts of these sit-in cases have little resemblance to any institution of property which we customarily associate with privacy.

Joseph H. Choate, who argued the Income Tax Cases (*Pollock* v. *Farmers' Loan & Trust Co.*, 157 U. S. 429, 534), said:

> "I have thought that one of the fundamental objects of all civilized government was the preservation of the rights of private property. I have thought that it was the very keystone of the arch upon which all civilized government rests, and that this once abandoned, everything was at stake and in danger. That is what Mr. Webster said in 1820, at Plymouth, and I supposed that all educated, civilized men believed in that."

Charles A. Beard had the theory that the Constitution was "an economic document drawn with superb skill by men whose property interests were immediately at stake." An Economic Interpretation of the Constitution of the United States (1939), p. 188. That school of thought would receive new impetus from an affirmance of these judgments. Seldom have modern cases (cf. the illstarred *Dred Scott* decision, 19 How. 393) so exalted property in suppression of individual rights. We would

reverse the modern trend were we to hold that property voluntarily serving the public can receive state protection when the owner refuses to serve some solely because they are colored.

There is no specific provision in the Constitution which protects rights of privacy and enables restaurant owners to refuse service to Negroes. The word "property" is, indeed, not often used in the Constitution, though as a matter of experience and practice we are committed to free enterprise. The Fifth Amendment makes it possible to take "private property" for public use only on payment of "just compensation." The ban on quartering soldiers in any home in time of peace, laid down by the Third Amendment, is one aspect of the right of privacy. The Fourth Amendment in its restrictions on searches and seizures also sets an aura of privacy around private interests. And the Due Process Clauses of the Fifth and Fourteenth Amendments lay down the command that no person shall be deprived "of life, liberty, or *property*, without due process of law." (Italics added.) From these provisions those who would affirm find emanations that lead them to the conclusion that the private owner of a restaurant serving the public can pick and choose whom he will serve and restrict his dining room to *whites* only.

*Apartheid,* however, is barred by the common law as respects innkeepers and common carriers. There were, to be sure, criminal statutes that regulated the common callings. But the civil remedies were made by judges who had no written constitution. We, on the other hand, live under a constitution that proclaims equal protection under the law. Why then, even in the absence of a statute, should *apartheid* be given constitutional sanction in the restaurant field? That was the question I asked in *Lombard* v. *Louisiana,* 373 U. S. 267. I repeat it here. Constitutionally speaking, why should Hooper Food Co., Inc.,

or Peoples Drug Stores—or any other establishment that dispenses food or medicines—stand on a higher, more sanctified level than Greyhound Bus when it comes to a constitutional right to pick and choose its customers?

The debates on the Fourteenth Amendment show, as my Brother GOLDBERG points out, that one of its purposes was to grant the Negro "the rights and guarantees of the good old common law." *Post,* at 294. The duty of common carriers to carry all, regardless of race, creed, or color, was in part the product of the inventive genius of judges. See *Lombard* v. *Louisiana,* 373 U. S., at 275–277. We should make that body of law the common law of the Thirteenth and Fourteenth Amendments so to speak. Restaurants in the modern setting are as essential to travelers as inns and carriers.

Are they not as much affected with a public interest? Is the right of a person to eat less basic than his right to travel, which we protected in *Edwards* v. *California,* 314 U. S. 160? Does not a right to travel in modern times shrink in value materially when there is no accompanying right to eat in public places?

The right of any person to travel *interstate* irrespective of race, creed, or color is protected by the Constitution. *Edwards* v. *California, supra.* Certainly his right to travel *intrastate* is as basic. Certainly his right to eat at public restaurants is as important in the modern setting as the right of mobility. In these times that right is, indeed, practically indispensable to travel either interstate or intrastate.

## V.

The requirement of equal protection, like the guarantee of privileges and immunities of citizenship, is a constitutional command directed to each State.

State judicial action is as clearly "state" action as state administrative action. Indeed, we held in *Shelley* v. *Kraemer,* 334 U. S. 1, 20, that "State action, as that

phrase is understood for the purposes of the Fourteenth Amendment, refers to exertions of state power in all forms."

That case involved suits in state courts to enforce restrictive covenants in deeds of residential property whereby the owner agreed that it should not be used or occupied by any person except a Caucasian. There was no state statute regulating the matter. That is, the State had not authorized by legislative enactment the use of restrictive covenants in residential property transactions; nor was there any administrative regulation of the matter. Only the courts of the State were involved. We held without dissent in an opinion written by Chief Justice Vinson that there was nonetheless state action within the meaning of the Fourteenth Amendment:

> "The short of the matter is that from the time of the adoption of the Fourteenth Amendment until the present, it has been the consistent ruling of this Court that the action of the States to which the Amendment has reference includes action of state courts and state judicial officials. Although, in construing the terms of the Fourteenth Amendment, differences have from time to time been expressed as to whether particular types of state action may be said to offend the Amendment's prohibitory provisions, it has never been suggested that state court action is immunized from the operation of those provisions simply because the act is that of the judicial branch of the state government." *Id.,* at 18.

At the time of the *Shelley* case there was to be sure a Congressional Civil Rights Act that guaranteed all citizens the same right to purchase and sell property "as is enjoyed by white citizens." *Id.,* at 11. But the existence of that statutory right, like the existence of a right under

the Constitution, is no criterion for determining what is or what is not "state" action within the meaning of the Fourteenth Amendment. The conception of "state" action has been considered in light of the degree to which a State has participated in depriving a person of a right. "Judicial" action alone has been considered ample in hundreds of cases. Thus, "state action" took place *only by judicial action* in cases involving the use of coerced confessions (*e. g., Chambers* v. *Florida,* 309 U. S. 227), the denial to indigents of equal protection in judicial proceedings (*e. g., Griffin* v. *Illinois,* 351 U. S. 12), and the action of state courts in punishing for contempt by publication (*e. g., Bridges* v. *California,* 314 U. S. 252).

Maryland's action against these Negroes was as authoritative as any case where the State in one way or another puts its full force behind a policy. The policy here was segregation in places of public accommodation; and Maryland enforced that policy with her police, her prosecutors, and her courts.

The owners of the residential property in *Shelley* v. *Kraemer* were concerned, as was the corporate owner of this Maryland restaurant, over a possible decrease in the value of the property if Negroes were allowed to enter. It was testified in *Shelley* v. *Kraemer* that white purchasers got better bank loans than Negro purchasers:

> "A. Well, I bought 1238 north Obert, a 4-family flat, about a year ago through a straw party, and I was enabled to secure a much larger first deed of trust than I would have been able to do at the present home on Garfield.
>
> "The Court: I understand what you mean: it's easier to finance?
>
> "A. Yes, easier to finance through white. That's common knowledge.

"Q. You mean if property is owned by a white person it's easier to finance it?

"A. White can secure larger loans, better loans. I have a 5% loan."

In *McGhee* v. *Sipes,* a companion case to *Shelley* v. *Kraemer,* a realtor testified:

"I have seen the result of influx of colored people moving into a white neighborhood. There is a depression of values to start with, general run down of the neighborhood within a short time afterwards. I have, however, seen one exception. The colored people on Scotten, south of Tireman have kept up their property pretty good and enjoyed them. As a result of this particular family moving in the people in the section are rather panic-stricken and they are willing to sell—the only thing that is keeping them from throwing their stuff on the market and giving it away is the fact that they think they can get one or two colored people in there out of there. My own sales have been affected by this family. . . .

"I am familiar with the property at 4626 Seebaldt, and the value of it with a colored family in it is fifty-two hundred, and if there was no colored family in it I would say sixty-eight hundred. I would say seven thousand is a fair price for that property."

While the purpose of the restrictive covenant is in part to protect the commercial values in a "closed" community (see *Hundley* v. *Gorewitz,* 77 U. S. App. D. C. 48, 132 F. 2d 23, 24), it at times involves more. The sale to a Negro may bring a higher price than a sale to a white. See *Swain* v. *Maxwell,* 355 Mo. 448, 454, 196 S. W. 2d 780, 785. Yet the resistance to having a Negro as a neighbor is often strong. All-white or all-Caucasian residential communities are often preferred by the owners.

An occupant of a "white" area testified in *Hurd* v. *Hodge,* 334 U. S. 24, another companion case to *Shelley* v. *Kraemer:*

> ". . . we feel bitter towards you for coming in and breaking up our block. We were very peaceful and harmonious there and we feel that you bought that property just to transact it over to colored people and we don't like it, and naturally we feel bitter towards you . . . ."

This witness added:

> "A. The complexion of the person doesn't mean anything.
>
> "Q. The complexion does not?
>
> "A. It is a fact that he is a negro.
>
> "Q. I see, so no matter how brown a negro may be, no matter how white they are, you object to them?
>
> "A. I would say yes, Mr. Houston. . . . I want to live with my own color people."

The preferences involved in *Shelley* v. *Kraemer* and its companion cases were far more personal than the motivations of the corporate managers in the present case when they declined service to Negroes. Why should we refuse to let state courts enforce *apartheid* in residential areas of our cities but let state courts enforce *apartheid* in restaurants? If a court decree is state action in one case, it is in the other. Property rights, so heavily underscored, are equally involved in each case.

The customer in a restaurant is transitory; he comes and may never return. The colored family who buys the house next door is there for keeps—night and day. If "personal prejudices" are not to be the criterion in one case they should not be in the other. We should put these restaurant cases in line with *Shelley* v. *Kraemer,* holding that what the Fourteenth Amendment requires in restrictive covenant cases it also requires from restaurants.

Segregation of Negroes in the restaurants and lunch counters of parts of America is a relic of slavery. It is a badge of second-class citizenship. It is a denial of a privilege and immunity of national citizenship and of the equal protection guaranteed by the Fourteenth Amendment against abridgment by the States. When the state police, the state prosecutor, and the state courts unite to convict Negroes for renouncing that relic of slavery, the "State" violates the Fourteenth Amendment.

I would reverse these judgments of conviction outright, as these Negroes in asking for service in Hooper's restaurant were only demanding what was their constitutional right.

### APPENDIX I TO OPINION OF MR. JUSTICE DOUGLAS.

In the sit-in cases involving eating places last Term and this Term, practically all restaurant or lunch counter owners whose constitutional rights were vindicated below are corporations. Only two out of the 20 before us are noncorporate, as Appendix III shows. Some of these corporations are small, privately owned affairs. Others are large, national or regional businesses with many stockholders:

S. H. Kress & Co., operating 272 stores in 30 States, its stock being listed on the New York Stock Exchange; McCrory Corporation, with 1,307 stores, its stock being listed on the New York Stock Exchange; J. J. Newberry Co., with 567 stores of which 371 serve food, its stock being listed on the New York Stock Exchange; F. W. Woolworth Co., with 2,130 stores, its stock also being listed on the New York Stock Exchange; Eckerd Drugs, having 17 stores with its stock traded over-the-counter. F. W. Woolworth has over 90,000 stockholders; J. J. Newberry about 8,000; McCrory over 24,000; S. H. Kress over 8,000; Eckerd Drugs about 1,000.

At the national level most "eating places," as Appendix IV shows, are individual proprietorships or partnerships. But a substantial number are corporate in form; and even though in numbers they are perhaps an eighth of the others, in business done they make up a much larger percentage of the total.

Those living in the Washington, D. C., metropolitan area know that it is true in that area—the hotels are incorporated; Howard Johnson Co., listed on the New York Stock Exchange, has 650 restaurants and over 15,000 stockholders; Hot Shoppes, Inc., has 4,900 stockholders; Thompson Co. (involved in *District of Columbia* v. *Thompson Co.*, 346 U. S. 100) has 50 restaurants in this country with over 1,000 stockholders and its stock is listed on the New York Stock Exchange; Peoples Drug Stores, with a New York Stock Exchange listing, has nearly 5,000 stockholders. See Moody's Industrial Manual (1963 ed.).

All the sit-in cases involve a contest in a criminal trial between Negroes who sought service and state prosecutors and state judges who enforced trespass laws against them. The corporate beneficiaries of these convictions, those whose constitutional rights were vindicated by these convictions, are not parties to these suits. The beneficiary in the present case was Hooper Food Co., Inc., a Maryland corporation; and as seen in Appendix IV, "eating places" in Maryland owned by corporations, though not a fourth in number of those owned by individuals or partnerships, do nearly as much business as the other two combined.

So far as the corporate owner is concerned, what constitutional right is vindicated? It is said that ownership of property carries the right to use it in association with such people as the owner chooses. The corporate owners in these cases—the stockholders—are unidentified members of the public at large, who probably never saw these petitioners, who may never have fre-

quented these restaurants. What personal rights of theirs would be vindicated by affirmance? Why should a stockholder in Kress, Woolworth, Howard Johnson, or any other corporate owner in the restaurant field have standing to say that any associational rights personal to him are involved? Why should his interests—his associational rights—make it possible to send these Negroes to jail?

Who, in this situation, is the corporation? Whose racial prejudices are reflected in "its" decision to refuse service to Negroes? The racial prejudices of the manager? Of the stockholders? Of the board of directors?

The Court in *Santa Clara County* v. *Southern Pacific R. Co.*, 118 U. S. 394, interrupted counsel on oral argument to say, "The court does not wish to hear argument on the question whether the provision in the Fourteenth Amendment to the Constitution, which forbids a State to deny to any person within its jurisdiction the equal protection of the laws, applies to these corporations. We are all of opinion that it does." 118 U. S., at 396. Later the Court held that corporations are "persons" within the meaning of the Due Process Clause of the Fourteenth Amendment. *Minneapolis R. Co.* v. *Beckwith,* 129 U. S. 26, 28. While that view is the law today, it prevailed only over dissenting opinions. See the dissent of MR. JUSTICE BLACK in *Connecticut General Co.* v. *Johnson,* 303 U. S. 77, 85; and my dissent in *Wheeling Steel Corp.* v. *Glander,* 337 U. S. 562, 576. MR. JUSTICE BLACK said of that doctrine and its influence:

> ". . . of the cases in this Court in which the Fourteenth Amendment was applied during the first fifty years after its adoption, less than one-half of one per cent. invoked it in protection of the negro race, and more than fifty per cent. asked that its benefits be extended to corporations." *Connecticut General Co.* v. *Johnson,* 303 U. S., at 90.

A corporation, like any other "client," is entitled to the attorney-client privilege. See *Radiant Burners, Inc., v. American Gas Assn.,* 320 F. 2d 314. A corporation is protected as a publisher by the Freedom of the Press Clause of the First Amendment. *Grosjean* v. *American Press Co.,* 297 U. S. 233, 244; *New York Times Co.* v. *Sullivan,* 376 U. S. 254. A corporation, over the dissent of the first Mr. Justice Harlan, was held entitled to protection against unreasonable searches and seizures by reason of the Fourth Amendment. *Hale* v. *Henkel,* 201 U. S. 43, 76–77. On the other hand the privilege of self-incrimination guaranteed by the Fifth Amendment cannot be utilized by a corporation. *United States* v. *White,* 322 U. S. 694. "The constitutional privilege against self-incrimination is essentially a personal one, applying only to natural individuals." *Id.,* at 698.

We deal here, we are told, with personal rights—the rights pertaining to property. One need not share his home with one he dislikes. One need not allow another to put his foot upon his private domain for any reason he desires—whether bigoted or enlightened. In the simple agricultural economy that Jefferson extolled, the conflicts posed were highly personal. But how is a "personal" right infringed when a corporate chain store, for example, is forced to open its lunch counters to people of all races? How can that so-called right be elevated to a constitutional level? How is that corporate right more "personal" than the right against self-incrimination?

The revolutionary change effected by an affirmance in these sit-in cases would be much more damaging to an open and free society than what the Court did when it gave the corporation the sword and the shield of the Due Process and Equal Protection Clauses of the Fourteenth Amendment. Affirmance finds in the Constitution a corporate right to refuse service to anyone "it" chooses and to get the State to put people in jail who defy "its" will.

More precisely, affirmance would give corporate management vast dimensions for social planning.[1]

*Affirmance would make corporate management the arbiter of one of the deepest conflicts in our society:* corporate management could then enlist the aid of state police, state prosecutors, and state courts to force *apartheid* on the community they served, if *apartheid* best suited the corporate need; or, if its profits would be better served by lowering the barriers of segregation, it could do so.

Veblen, while not writing directly about corporate management and the racial issue, saw the danger of leaving fundamental, governmental decisions to the managers or absentee owners of our corporate enterprises:

> "Absentee ownership and absentee management on this grand scale is immune from neighborly personalities and from sentimental considerations and scruples.
>
> "It takes effect through the colorless and impersonal channels of corporation management, at the

---

[1] The conventional claims of corporate management are stated in Ginzberg and Berg, Democratic Values and the Rights of Management (1963), pp. 153–154:

"The founding fathers, despite some differences of opinion among them, were of one mind when it came to fundamentals—the best guarantee of freedom was the retention by the individual of the broadest possible scope for decision-making. And early in the nation's history, when the Supreme Court decided that the corporation possessed many of the same rights as individuals, continuity was maintained in basic structure; the corporate owner as well as the individual had wide scope for decision-making. In recent decades, another extension of this trend became manifest. The agents of owners—the managers—were able to subsume for themselves the authorities inherent in ownership. The historical record, then, is clear. The right to do what one likes with his property lies at the very foundation of our historical experience. This is a basis for management's growing concern with the restrictions and limitations which have increasingly come to characterize an arena where the widest scope for individual initiative previously prevailed."

hands of businesslike officials whose discretion and responsibility extend no farther than the procuring of a reasonably large—that is to say the largest obtainable—net gain in terms of price. The absentee owners are removed out of all touch with the working personnel or with the industrial work in hand, except such remote, neutral and dispassionate contact by proxy as may be implied in the continued receipt of a free income; and very much the same is true for the business agents of the absentee owners, the investment-bankers and the staff of responsible corporation officials. Their relation to what is going on, and to the manpower by use of which it is going on, is a fiscal relation. As industry, as a process of workmanship and a production of the means of life, the work in hand has no meaning for the absentee owners sitting in the fiscal background of these vested interests. Personalities and tangible consequences are eliminated and the business of governing the rate and volume of the output goes forward in terms of funds, prices, and percentages." Absentee Ownership (1923), pp. 215–216.

The point is that corporate motives in the retail field relate to corporate profits, corporate prestige, and corporate public relations.[2] Corporate motives have no tinge of

---

[2] "Fred Harvey, president of Harvey's Department Store in Nashville, says that when his store desegregated its lunch counters in 1960 only 13 charge accounts were closed out of 60,000. 'The greatest surprise I ever had was the apparent "so-what" attitude of white customers,' says Mr. Harvey.

"Even where business losses occur, they usually are only temporary. At the 120-room Peachtree Manor Hotel in Atlanta, owner Irving H. Goldstein says his business dropped off 15% when the hotel desegregated a year ago. 'But now we are only slightly behind a year ago and we can see we are beginning to recapture the business we initially lost,' declares Mr. Goldstein.

"William F. Davoren, owner of the Brownie Drug Co. in Huntsville, Ala., reports that though his business fell a bit for several weeks after

an individual's choice to associate only with one class of customers, to keep members of one race from his "property," to erect a wall of privacy around a business in the manner that one is erected around the home.

___

lunch counters were desegregated, he's now picked up all that he lost. Says he: 'I could name a dozen people who regarded it as a personal affront when I started serving Negroes, but have come back as if nothing had happened.'

"Even a segregation-minded businessman in Huntsville agrees that white customers frequently have short memories when it comes to the race question. W. T. Hutchens, general manager of three Walgreen stores there, says he held out when most lunch counter operators gave in to sit-in pressures last July. In one shopping center where his competition desegregated, Mr. Hutchens says his business shot up sharply and the store's lunch counter volume registered a 12% gain for the year. However, this year business has dropped back to pre-integration levels 'because a lot of people have forgotten' the defiant role his stores played during the sit-ins, he adds.

"Some Southern businessmen who have desegregated say they have picked up extra business as a result of the move.

"At Raleigh, N. C., where Gino's Restaurant was desegregated this year, owner Jack Griffiths reports only eight whites have walked out after learning the establishment served Negroes, and he says, 'we're getting plenty of customers to replace the hard-headed ones.'

"In Dallas, integration of hotels and restaurants has 'opened up an entirely new area of convention prospects,' according to Ray Bennison, convention manager of the Chamber of Commerce. 'This year we've probably added $8 million to $10 million of future bookings because we're integrated,' Mr. Bennison says." Wall Street Journal, July 15, 1963, pp. 1, 12.

As recently stated by John Perry:

"The manager has become accustomed to seeing well-dressed Negroes in good restaurants, on planes and trains, in church, in hotel lobbies, at United Fund meetings, on television, at his university club. Only a few years ago, if he met a Negro at some civic or political meeting, he understood that the man was there because he was a Negro; he was a kind of exhibit. Today it is much more likely that the Negro is there because of his position or profession. It makes a difference that everyone feels.

"The manager is aware that companies other than his are changing. He sees it happening. He reads about it. It is talked about, usually

At times a corporation has standing to assert the constitutional rights of its members, as otherwise the rights peculiar to the members as individuals might be lost or impaired.   Thus in *NAACP* v. *Alabama*, 357 U. S. 449, the question was whether the N. A. A. C. P., a membership corporation, could assert on behalf of its members a right personal to them to be protected from compelled disclosure by the State of their affiliation with it.   In that context we said the N. A. A. C. P. was "the appropriate party to assert these rights, because it and its members are in every practical sense identical."   *Id.*, at 459.   We felt, moreover, that to deny the N. A. A. C. P. standing to raise the question and to require it to be claimed by the members themselves "would result in nullification of the right at the very moment of its assertion."   *Ibid.*   Those were the important reasons governing our decision, the adverse effect of disclosure on the N. A. A. C. P. itself being only a make-weight.   *Id.*, at 459–460.

The corporate owners of a restaurant, like the corporate owners of streetcars, buses, telephones, and electric light and gas facilities, are interested in balance sheets and in profit and loss statements.   "It" does not stand at the door turning Negroes aside because of "its" feelings of antipathy to black-skinned people.   "It" does not have any associational rights comparable to the classic individual store owner at a country crossroads whose store, in the dichotomy of an Adam Smith, was indeed no different from his home.   "It" has been greatly transformed, as Berle and Means, The Modern Corporation and Private Property (1932), made clear a generation ago; and "it" has also transformed our economy.   Separation of power

---

off the record and informally, at business gatherings. So, in due course, questions are shaped in his mind: 'How can we keep in step? How can we change, without making a big deal of it?   Can we do it without a lot of uproar?' "   Business—Next Target for Integration, March-April, 1963, Harvard Business Rev., pp. 104, 111.

or control from beneficial ownership was part of the phenomenon of change:

"This dissolution of the atom of property destroys the very foundation on which the economic order of the past three centuries has rested. Private enterprise, which has molded economic life since the close of the middle ages, has been rooted in the institution of private property. Under the feudal system, its predecessor, economic organization grew out of mutual obligations and privileges derived by various individuals from their relation to property which no one of them owned. Private enterprise, on the other hand, has assumed an owner of the instruments of production with complete property rights over those instruments. Whereas the organization of feudal economic life rested upon an elaborate system of binding customs, the organization under the system of private enterprise has rested upon the self-interest of the property owner—a self-interest held in check only by competition and the conditions of supply and demand. Such self-interest has long been regarded as the best guarantee of economic efficiency. It has been assumed that, if the individual is protected in the right both to use his own property as he sees fit and to receive the full fruits of its use, his desire for personal gain, for profits, can be relied upon as an effective incentive to his efficient use of any industrial property he may possess.

"In the quasi-public corporation, such an assumption no longer holds. . . . it is no longer the individual himself who uses his wealth. Those in control of that wealth, and therefore in a position to secure industrial efficiency and produce profits, are no longer, as owners, entitled to the bulk of such profits. Those who control the destinies of the typi-

cal modern corporation own so insignificant a fraction of the company's stock that the returns from running the corporation profitably accrue to them in only a very minor degree. The stockholders, on the other hand, to whom the profits of the corporation go, cannot be motivated by those profits to a more efficient use of the property, since they have surrendered all disposition of it to those in control of the enterprise. The explosion of the atom of property destroys the basis of the old assumption that the quest for profits will spur the owner of industrial property to its effective use. It consequently challenges the fundamental economic principle of individual initiative in industrial enterprise." *Id.*, at 8–9.

By like token the separation of the atom of "property" into one unit of "management" and into another of "absentee ownership" has in other ways basically changed the relationship of that "property" to the public.

A corporation may exclude Negroes if "it" thinks "it" can make more money doing so. "It" may go along with community prejudices when the profit and loss statement will benefit; "it" is unlikely to go against the current of community prejudice when profits are endangered.[3]

---

[3] The New York Times stated the idea editorially in an analogous situation on October 31, 1963. P. 32:

"When it comes to speaking out on business matters, Roger Blough, chairman of the United States Steel Corporation, does not mince words.

"Mr. Blough is a firm believer in freedom of action for corporate management, a position he made clear in his battle with the Administration last year. But he also has put some severe limits on the exercise of corporate responsibility, for he rejects the suggestion that U. S. Steel, the biggest employer in Birmingham, Ala., should use its economic influence to erase racial tensions. Mr. Blough feels that U. S. Steel has fulfilled its responsibilities by following a non-discriminatory hiring policy in Birmingham, and looks upon any other

Veblen stated somewhat the same idea in Absentee Ownership (1923), p. 107:

". . . the arts of business are arts of bargaining, effrontery, salesmanship, make-believe, and are directed to the gain of the business man at the cost of the community, at large and in detail. Neither tangible performance nor the common good is a business proposition. Any material use which his traffic may serve is quite beside the business man's purpose, except indirectly, in so far as it may serve to influence his clientele to his advantage."

By this standard the bus company could refuse service to Negroes if "it" felt "its" profits would increase once *apartheid* were allowed in the transportation field.

In the instant case, G. Carroll Hooper, president of the corporate chain owning the restaurant here involved, testified concerning the episode that gave rise to these convictions. His reasons were wholly commercial ones, as we have already seen.

---

measures as both 'repugnant' and 'quite beyond what a corporation should do' to improve conditions.

"This hands-off strategy surely underestimates the potential influence of a corporation as big as U. S. Steel, particularly at the local level. It could, without affecting its profit margins adversely or getting itself directly involved in politics, actively work with those groups in Birmingham trying to better race relations. Steel is not sold on the retail level, so U. S. Steel has not been faced with the economic pressure used against the branches of national chain stores.

"Many corporations have belatedly recognized that it is in their own self-interest to promote an improvement in Negro opportunities. As one of the nation's biggest corporations, U. S. Steel and its shareholders have as great a stake in eliminating the economic imbalances associated with racial discrimination as any company. Corporate responsibility is not easy to define or to measure, but in refusing to take a stand in Birmingham, Mr. Blough appears to have a rather narrow, limited concept of his influence."

There are occasions when the corporation is little more than a veil for man and wife or brother and brother; and disregarding the corporate entity often is the instrument for achieving a just result. But the relegation of a Negro customer to second-class citizenship is not just. Nor is fastening *apartheid* on America a worthy occasion for tearing aside the corporate veil.

## APPENDIX II TO OPINION OF MR. JUSTICE DOUGLAS.

A. In *Green* v. *Virginia, post,* p. 550, the purpose or reason for not serving Negroes was ruled to be immaterial to the issues in the case.

B. In the following cases, the testimony of corporate officers shows that the reason was either a commercial one or, which amounts to the same thing, that service to Negroes was not in accord with local custom:

1. *Bouie* v. *City of Columbia, post,* p. 347.

Dr. Guy Malone, the manager of the Columbia branch of Eckerd Drugs of Florida, Inc., testified:

"Q. Mr. Malone, is the public generally invited to do business with Eckerd's?

"A. Yes, I would say so.

"Q. Does that mean all of the public of all races?

"A. Yes.

"Q. Are Negroes welcome to do business with Eckerd's?

"A. Yes.

"Q. Are Negroes welcome to do business at the lunch counter at Eckerd's?

"A. Well, we have never served Negroes at the lunch counter department.

"Q. According to the present policy of Eckerd's, the lunch counter is closed to members of the Negro public?

"A. I would say yes.

"Q. And all other departments of Eckerd's are open to members of the Negro public, as well as to other members of the public generally?

"A. Yes.

"Q. Mr. Malone, on the occasion of the arrest of these young men, what were they doing in your store, if you know?

"A. Well, it was four of them came in. Two of them went back and sat down at the first booth and started reading books, and they sat there for about fifteen minutes. Of course, we had had a group about a week prior to that, of about fifty, who came into the store.

"Mr. Perry: Your Honor, I ask, of course, that the prior incident be stricken from the record. That is not responsive to the question which has been asked, and is not pertinent to the matter of the guilt or innocence of these young men.

"The Court: All right, strike it.

"Mr. Sholenberger: Your Honor, this is their own witness.

"Mr. Perry: We announced at the outset that Mr. Malone would, in a sense, be a hostile witness.

.        .        .        .        .

"Q. And so, when a person comes into Eckerd's and seats himself at a place where food is ordinarily served, what is the practice of your employees in that regard?

"A. Well, it's to take their order.

"Q. Did anyone seek to take the orders of these young men?

"A. No, they did not.

"Q. Why did they not do so?

"A. Because we didn't want to serve them.

"Q. Why did you not want to serve them?

"A. I don't think I have to answer that.

"Q. Did you refuse to serve them because they were Negroes?

"A. No.

"Q. You did say, however, that Eckerd's has the policy of not serving Negroes in the lunch counter section?

"A. I would say that all stores do the same thing.

"Q. We're speaking specifically of Eckerd's?

"A. Yes.

"Q. Did you or any of your employees, Mr. Malone, approach these defendants and take their order for food?

"A. No."

2. *Robinson* v. *Florida, ante,* p. 153.

A Vice President of Shell's City, Inc., testified:

"Q. Why did you refuse to serve these defendants?

"A. Because I feel, definitely, it is very detrimental to our business to do so.

"Q. What do you mean 'detrimental'?

"A. Detrimental because it would mean a loss of business to us to serve mixed groups."

Another Vice President of Shell's City, Inc., testified:

"Q. You have several departments in your store, do you not?

"A. Yes. Nineteen, I believe. Maybe twenty.

"Q. Negroes are invited to participate and make purchases in eighteen of these departments?

"A. Yes, sir.

"Q. Can you distinguish between your feeling that it is not detrimental to have them served in eighteen departments and it is detrimental to have them served in the nineteenth department, namely, the lunch counter?

"A. Well, it goes back to what is the custom, that is, the tradition of what is basically observed in Dade County would be the bottom of it. We have—

.        .        .        .        .

"Q. Would you tell me what this custom is, that you are making reference to, that would prevent you from serving Negroes at your lunch counter?

"A. I believe I already answered that, that it is the customs and traditions and practice in this county—not only in this county but in this part of the state and elsewhere, not to serve whites and colored people seated in the same restaurant. That's my answer.

"Q. Was that the sole reason, the sole basis, for your feeling that this was detrimental to your business?

"A. Well, that is the foundation of it, yes, but we feel that at this time if we went into a thing of trying to break that barrier, we might have racial trouble, which we don't want. We have lots of good friends among colored people and will have when this case is over.

"Q. Are you familiar with the fact that the Woolworth Stores in this community have eliminated this practice?

"Mr. Goshgarian: To which the State objects. It is irrelevant and immaterial.

"The Court: The objection is sustained."

3. *Fox* v. *North Carolina, post,* p. 587.

Mr. Claude M. Breeden, the manager of the McCrory branch in Raleigh, testified:

"I just don't serve colored. I don't have the facilities for serving colored. Explaining why I don't serve colored. I don't have the facilities for serving colored. I have the standard short order lunch, but I don't serve colored. I don't serve colored because I don't have the facilities for serving colored.

"COUNSEL FOR DEFENDANT: What facilities would be necessary for serving colored?

"SOLICITOR FOR STATE: Objection.

"The COURT: Sustained.

"WITNESS CONTINUES: It is not the policy of my store to discriminate and not serve Negroes. We have no policy against discrimination. I do not discriminate and it is not the custom in the Raleigh Store to discriminate. I do not have the facilities for serving colored and that is why I don't serve colored."

4. *Mitchell* v. *City of Charleston, post,* p. 551.

Mr. Albert C. Watts, the manager of the S. H. Kress & Co. outlet in Charleston, testified:

"Q. . . . What type of business is Kress's?

"A. Five and Ten Cent variety store.

"Q. Could you tell us briefly something about what commodities it sells—does it sell just about every type of commodity that one might find in this type establishment?

"A. Strictly variety store merchandise—no appliances or anything like that.

"Q. I see. Kress, I believe it invites members of the public generally into its premises to do business, does it not?

"A. Yes.

"Q. It invites Negroes in to do business, also?

"A. Right.

"Q. Are Negroes served in all of the departments of Kress's except your lunch counter?

"A. We observe local custom.

"Q. In Charleston, South Carolina, the store that you manage, sir, does Kress's serve Negroes at the lunch counter?

"A. No. It is not a local custom.

"Q. To your knowledge, does the other like businesses serve Negroes at their lunch counters? What might happen at Woolworth's or some of the others?

"A. They observe local custom—I say they wouldn't.

"Q. Then you know of your own knowledge that they do not serve Negroes? Are you speaking of other business such as your business?

"A. I can only speak in our field, yes.

"Q. In your field, so that the other stores in your field do not serve Negroes at their lunch counters?

"A. Yes, sir."

5. *Hamm* v. *City of Rock Hill,* 377 U. S. 988.

Mr. H. C. Whiteaker, the manager of McCrory's in Rock Hill, testified:

"Q. All right. Now, how many departments do you have in your store?

"A. Around twenty.

"Q. Around twenty departments?

"A. Yes, sir.

"Q. All right, sir, is one of these departments considered a lunch counter or establishment where food is served?

"A. Yes, sir. That is a separate department.

.        .        .        .        .

"Q. Now, I believe, is it true that you invite members of the public to come into your store?

"A. Yes, it is for the public.

"Q. And is it true, too, that the public to you means everybody, various races, religions, nationalities?

"A. Yes, sir.

"Q. The policy of your store as manager is not to exclude anybody from coming in and buying these three thousand items on account of race, nationality or religion, is that right?

"A. The only place where there has been exception, where there is an exception, is at our lunch counter.

"Q. Oh, I see. Is that a written policy you get from headquarters in New York?

"A. No, sir.

"Q. It is not. You don't have any memorandum in your store that says that is a policy?

"A. No, sir.

.        .        .        .        .

"Q. Is it true, then, that if, that, well, even if a man was quiet enough, and a Communist, that he could sit at your lunch counter and eat, according to the policy of your store right now? Whether you knew he was a Com-

munist or not, so his political beliefs would not have anything to do with it, is that right?

"A. No.

"Q. Now, sir, you said that there was a policy there as to Negroes sitting.   Am I to understand that you do serve Negroes or Americans who are Negroes, standing up?

"A. To take out, at the end of the counter, we serve take-outs, yes, sir.

"Q. In other words, you have a lunch counter at the end of your store?

"A. No, I said at the end, they can wait and get a package or a meal or order a coke or hamburger and take it out.

"Q. Oh, to take out.   They don't normally eat it on the premises?

"A. They might, but usually it is to take out.

.        .        .        .        .

"Q. Of course, you probably have some Negro employees in your store, in some capacity, don't you?

"A. Yes, sir.

"Q. They eat on the premises, is that right?

"A. Yes, sir.

"Q. But not at the lunch counter?

"A. No, sir.

.        .        .        .        .

"Q. Oh, I see, but generally speaking, you consider the American Negro as part of the general public, is that right, just generally speaking?

"A. Yes, sir.

"Q. You don't have any objections for him spending any amount of money he wants to on these 3,000 items, do you?

"A. That's up to him to spend if he wants to spend.

"Q. This is a custom, as I understand it, this is a custom instead of a law that causes you not to want him to ask for service at the lunch counter?

"A. There is no law to my knowledge, it is merely a custom in this community."

C. The testimony in the following cases is less definitive with respect to why Negroes were refused service.

In *Griffin* v. *Maryland, ante,* p. 130, the president of the corporations which own and operate Glen Echo Amusement Park said he would admit Chinese, Filipinos, Indians and, generally, anyone but Negroes. He did not elaborate, beyond stating that a private property owner has the right to make such a choice.

In *Barr* v. *City of Columbia, ante,* p. 146, the co-owner and manager of the Taylor Street Pharmacy said Negroes could purchase in other departments of his store and that whether for business or personal reasons, he felt he had a right to refuse service to anyone.

In *Williams* v. *North Carolina, post,* p. 548, the president of Jones Drug Company said Negroes were not permitted to take seats at the lunch counter. He did say, however, that Negroes could purchase food and eat it on the premises so long as they *stood* some distance from the lunch counter, such as near the back door.

In *Lupper* v. *Arkansas,* 377 U. S. 989, and *Harris* v. *Virginia, post,* p. 552, the record discloses only that the establishment did not serve Negroes.

### APPENDIX III TO OPINION OF MR. JUSTICE DOUGLAS.

Corporate [1] Business Establishments Involved In The "Sit-in" Cases Before This Court During The 1962 Term And The 1963 Term. Reference (other than the record in each case): Moody's Industrial Manual (1963 ed.).

---

[1] The only "sit-in" cases not involving a corporation are *Barr* v. *City of Columbia, ante,* p. 146, and *Daniels* v. *Virginia,* 374 U. S. 500. In *Barr,* the business establishment was the Taylor Street Pharmacy, which apparently is a partnership; in *Daniels,* it was the 403 Restaurant in Alexandria, Virginia, an individual proprietorship.

1. Gus Blass & Co. Department Store.
   Case: *Lupper* v. *Arkansas,* 377 U. S. 989.
   Location: Little Rock, Arkansas.
   Ownership: Privately owned corporation.

2. Eckerd Drugs of Florida, Inc.
   Case: *Bouie* v. *City of Columbia, post,* p. 347.
   Location: 17 retail drugstores throughout Southern States.
   Ownership: Publicly owned corporation.
   Number of shareholders: 1,000.
   Stock traded: Over-the-counter market.

3. George's Drug Stores, Inc.
   Case: *Harris* v. *Virginia, post,* p. 552.
   Location: Hopewell, Virginia.
   Ownership: Privately owned corporation.

4. Gwynn Oak Park, Inc.
   Case: *Drews* v. *Maryland, post,* p. 547.
   Location: Baltimore, Maryland.
   Ownership: Privately owned corporation.

5. Hooper Food Company, Inc.
   Case: *Bell* v. *Maryland, supra,* p. 226.
   Location: Several restaurants in Baltimore, Maryland.
   Ownership: Privately owned corporation.

6. Howard Johnson Co.
   Case: *Henry* v. *Virginia,* 374 U. S. 98.
   Location: 650 restaurants in 25 States.
   Ownership: Publicly owned corporation.
   Number of shareholders: 15,203.
   Stock traded: New York Stock Exchange.

7. Jones Drug Company, Inc.
   Case: *Williams* v. *North Carolina, post,* p. 548.
   Location: Monroe, North Carolina.
   Ownership: Privately owned corporation.

8. Kebar, Inc. (lessee from Rakad, Inc.).

Case: *Griffin* v. *Maryland, ante,* p. 130.
Location: Glen Echo Amusement Park, Maryland.
Ownership: Privately owned corporation.

9. S. H. Kress & Company.

Cases: *Mitchell* v. *City of Charleston, post,* p. 551;
*Avent* v. *North Carolina,* 373 U. S. 375; *Gober* v.
*City of Birmingham,* 373 U. S. 374; *Peterson*
v. *City of Greenville,* 373 U. S. 244.
Location: 272 stores in 30 States.
Ownership: Publicly owned corporation.
Number of shareholders: 8,767.
Stock traded: New York Stock Exchange.

10. Loveman's Department Store (food concession oper-
ated by Price Candy Company of Kansas City).

Case: *Gober* v. *City of Birmingham, supra.*
Location: Birmingham, Alabama.
Ownership: Privately owned corporation.

11. McCrory Corporation.

Cases: *Fox* v. *North Carolina, post,* p. 587; *Hamm*
v. *City of Rock Hill,* 377 U. S. 988; *Lombard* v.
*Louisiana,* 373 U. S. 267.
Location: 1,307 stores throughout the United
States.
Ownership: Publicly owned corporation.
Number of shareholders: 24,117.
Stock traded: New York Stock Exchange.

12. National White Tower System, Incorporated.

Case: *Green* v. *Virginia, post,* p. 550.
Location: Richmond, Virginia, and other cities
(number unknown).
Ownership: Apparently a privately owned cor-
poration.

13. J. J. Newberry Co.

> Case: *Gober* v. *City of Birmingham, supra.*
> Location: 567 variety stores in 46 States; soda foun-
> tains, lunch bars, cafeterias and restaurants in 371
> stores.
> Ownership: Publicly owned corporation.
> Number of shareholders: 7,909.
> Stock traded: New York Stock Exchange.

14. Patterson Drug Co.

> Cases: *Thompson* v. *Virginia,* 374 U. S. 99; *Wood*
> v. *Virginia,* 374 U. S. 100.
> Location: Lynchburg, Virginia.
> Ownership: Privately owned corporation.

15. Pizitz's Department Store.

> Case: *Gober* v. *City of Birmingham, supra.*
> Location: Birmingham, Alabama.
> Ownership: Privately owned corporation.

16. Shell's City, Inc.

> Case: *Robinson* v. *Florida, ante,* p. 153.
> Location: Miami, Florida.
> Ownership: Privately owned corporation.

17. Thalhimer Bros., Inc., Department Store.

> Case: *Randolph* v. *Virginia,* 374 U. S. 97.
> Location: Richmond, Virginia.
> Ownership: Privately owned corporation.

18. F. W. Woolworth Company.

> Case: *Gober* v. *City of Birmingham, supra.*
> Location: 2,130 stores (primarily variety stores)
> throughout the United States.
> Ownership: Publicly owned corporation.
> Number of shareholders: 90,435.
> Stock traded: New York Stock Exchange.

## APPENDIX IV TO OPINION OF MR. JUSTICE DOUGLAS.

Legal form of organization—by kind of business.

Reference: United States Census of Business, 1958, Vol. I.

Retail trade—Summary Statistics (1961).

### A. UNITED STATES.

| | Establishments (number) | Sales ($1,000) |
|---|---|---|
| Eating places: | | |
| Total | 229,238 | $11,037,644 |
| Individual proprietorships | 166,003 | 5,202,308 |
| Partnerships | 37,756 | 2,062,830 |
| Corporations | 25,184 | 3,723,295 |
| Cooperatives | 231 | 13,359 |
| Other legal forms | 64 | 35,852 |
| | | |
| Drugstores with fountain: | | |
| Total | 24,093 | $3,535,637 |
| Individual proprietorships | 13,549 | 1,294,737 |
| Partnerships | 4,368 | 602,014 |
| Corporations | 6,140 | 1,633,998 |
| Cooperatives | 9 | (withheld) |
| Other legal forms | 27 | Do.. |
| | | |
| Proprietary stores with fountain: | | |
| Total | 2,601 | 132,518 |
| Individual proprietorships | 1,968 | 85,988 |
| Partnerships | 446 | (withheld) |
| Corporations | 185 | 21,090 |
| Cooperatives | ...... | .......... |
| Other legal forms | 2 | (withheld) |
| | | |
| Department stores: | | |
| Total | 3,157 | 13,359,467 |
| Individual proprietorships | 19 | (withheld) |
| Partnerships | 64 | 85,273 |
| Corporations | 3,073 | 13,245,916 |
| Cooperatives | 1 | (withheld) |
| Other legal forms | ...... | .......... |

## B. State of Maryland.[1]

| Eating places: | Establishments (number) | Sales ($1,000) |
|---|---|---|
| Total | 3,223 | 175,546 |
| Individual proprietorships | 2,109 | 72,816 |
| Partnerships | 456 | 30,386 |
| Corporations | 628 | 71,397 |
| Other legal forms | 30 | 947 |
| Drugstores, proprietary stores: | | |
| Total | 832 | 139,943 |
| Individual proprietorships | 454 | 42,753 |
| Partnership | 139 | (withheld) |
| Corporations | 235 | 76,403 |
| Other legal forms | 4 | (withheld) |
| Department stores: | | |
| Total | 43 | 247,872 |
| Individual proprietorships | ...... | .......... |
| Partnerships | ...... | .......... |
| Corporations | 43 | 247,872 |
| Other legal forms | ...... | .......... |

---

[1] A division into stores with or without fountains, furnished for the United States, is not furnished for individual States.

## APPENDIX V TO OPINION OF MR. JUSTICE DOUGLAS.

### STATE ANTIDISCRIMINATION LAWS.

*(As of March 18, 1964.)*

(PREPARED BY THE UNITED STATES COMMISSION ON CIVIL RIGHTS.)

| State | Privately owned public accommodations | Private employment | Private housing | Private schools | Private hospitals |
|---|---|---|---|---|---|
| Alaska | [1] 1959 | [1] 1959 | 1962 | ---- | [2] 1962 |
| California | 1897 | 1959 | 1963 | ---- | [2] 1959 |
| Colorado | 1885 | 1957 | 1959 | ---- | ---- |
| Connecticut | 1884 | 1947 | 1959 | ---- | [2] 1953 |
| Delaware | 1963 | 1960 | ---- | ---- | ---- |
| Hawaii | ---- | 1963 | ---- | ---- | ---- |
| Idaho | 1961 | 1961 | ---- | ---- | ---- |
| Illinois | 1885 | 1961 | ---- | [3] 1963 | [4] 1927 |
| Indiana | 1885 | 1945 | ---- | ---- | [2] 1963 |
| Iowa | 1884 | 1963 | ---- | ---- | ---- |
| Kansas | 1874 | 1961 | ---- | ---- | ---- |
| Kentucky [5] | ---- | ---- | ---- | ---- | ---- |
| Maine | 1959 | ---- | ---- | ---- | [2] 1959 |
| Maryland [6] | 1963 | ---- | ---- | ---- | ---- |
| Massachusetts | 1865 | 1946 | 1959 | 1949 | 1953 |
| Michigan [7] | 1885 | 1955 | ---- | ---- | ---- |
| Minnesota | 1885 | 1955 | 1961 | ---- | [2] 1943 |
| Missouri | ---- | 1961 | ---- | ---- | ---- |
| Montana | 1955 | ---- | ---- | ---- | ---- |
| Nebraska | 1885 | ---- | ---- | ---- | ---- |
| New Hampshire | 1961 | ---- | 1961 | ---- | [2] 1961 |
| New Jersey | 1884 | 1945 | 1961 | 1945 | 1951 |
| New Mexico | 1955 | 1949 | ---- | ---- | 1957 |
| New York | 1874 | 1945 | 1961 | 1945 | 1945 |
| North Dakota | 1961 | ---- | ---- | ---- | ---- |
| Ohio | 1884 | 1959 | ---- | ---- | [2] 1961 |
| Oregon | 1953 | 1949 | [8] 1959 | [9] 1951 | [2] 1961 |
| Pennsylvania | 1887 | 1955 | 1961 | 1939 | 1939 |
| Rhode Island | 1885 | 1949 | ---- | ---- | [2] 1957 |
| South Dakota | 1963 | ---- | ---- | ---- | ---- |
| Vermont | 1957 | 1963 | ---- | ---- | [2] 1957 |
| Washington [10] | 1890 | 1949 | ---- | 1957 | [2] 1957 |
| Wisconsin | 1895 | 1957 | ---- | ---- | ---- |
| Wyoming | 1961 | ---- | ---- | ---- | [2] 1961 |

The dates are those in which the law was first enacted; the underlining means that the law is enforced by a commission. In addition to the above, the following cities in States without pertinent laws have enacted antidiscrimination ordinances: Albuquerque, N. Mex. (housing); Ann Arbor, Mich. (housing); Baltimore, Md. (employment); Beloit, Wis. (housing); Chicago, Ill. (housing); El Paso, Tex. (public accommodations); Ferguson, Mo. (public accommodations); Grand Rapids, Mich. (housing); Kansas City, Mo. (public accommodations); Louisville, Ky. (public accommodations); Madison, Wis. (housing); Oberlin, Ohio (housing); Omaha, Nebr. (employment); Peoria, Ill. (housing); St. Joseph, Mo. (public accommodations); St. Louis, Mo. (housing and public accommodations); Toledo, Ohio (housing); University City, Mo. (public accommodations); Yellow Springs, Ohio (housing); and Washington, D.C. (public accommodations and housing).

[1] Alaska was admitted to the Union in 1959 with these laws on its books.

[2] Hospitals are not enumerated in the law; however, a reasonable interpretation of the broad language contained in the public accommodations law could include various health facilities.

[3] The law appears to be limited to business schools.

[4] Hospitals where operations (surgical) are performed are required to render emergency or first aid to any applicant if the accident or injury complained of could cause death or severe injury.

[5] In 1963, the Governor issued an executive order requiring all executive departments and agencies whose functions relate to the supervising or licensing of persons or organizations doing business to take all lawful action necessary to prevent racial or religious discrimination.

[6] In 1963, the law exempted 11 counties; in 1964, the coverage was extended to include all of the counties. See *ante*, p. 229, n. 1.

[7] See 1963 Mich. Atty. Gen. opinion holding that the State Commission on Civil Rights has plenary authority in housing.

[8] The statute does not cover housing *per se* but it prohibits persons engaged in the business from discriminating.

[9] The statute relates to vocational, professional, and trade schools.

[10] In 1962, a Washington lower court held that a real estate broker is within the public accommodations law.

MR. JUSTICE GOLDBERG, with whom THE CHIEF JUSTICE joins, and with whom MR. JUSTICE DOUGLAS joins as to Parts II–V, concurring.

## I.

I join in the opinion and the judgment of the Court and would therefore have no occasion under ordinary circumstances to express my views on the underlying constitutional issue. Since, however, the dissent at length discusses this constitutional issue and reaches a conclusion with which I profoundly disagree, I am impelled to state the reasons for my conviction that the Constitution guarantees to all Americans the right to be treated as equal members of the community with respect to public accommodations.

## II.

The Declaration of Independence states the American creed: "We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness." This ideal was not fully achieved with the adoption of our Constitution because of the hard and tragic reality of Negro slavery. The Constitution of the new Nation, while heralding liberty, in effect declared all men to be free and equal—except black men who were to be neither free nor equal. This inconsistency reflected a fundamental departure from the American creed, a departure which it took a tragic civil war to set right. With the adoption, however, of the Thirteenth, Fourteenth, and Fifteenth Amendments to the Constitution, freedom and equality were guaranteed expressly to all regardless "of race, color, or previous condition of servitude." [1] *United States* v. *Reese,* 92 U. S. 214, 218.

---

[1] See generally Flack, The Adoption of the Fourteenth Amendment (1908); Harris, The Quest for Equality (1960).

In light of this American commitment to equality and the history of that commitment, these Amendments must be read not as "legislative codes which are subject to continuous revision with the changing course of events, but as the revelation of the great purposes which were intended to be achieved by the Constitution as a continuing instrument of government." *United States* v. *Classic,* 313 U. S. 299, 316. The cases following the 1896 decision in *Plessy* v. *Ferguson,* 163 U. S. 537, too often tended to negate this great purpose. In 1954 in *Brown* v. *Board of Education,* 347 U. S. 483, this Court unanimously concluded that the Fourteenth Amendment commands equality and that racial segregation by law is inequality. Since *Brown* the Court has consistently applied this constitutional standard to give real meaning to the Equal Protection Clause "as the revelation" of an enduring constitutional purpose.[2]

The dissent argues that the Constitution permits American citizens to be denied access to places of public accommodation solely because of their race or color. Such a view does not do justice to a Constitution which

---

[2] *E. g., Anderson* v. *Martin,* 375 U. S. 399; *Goss* v. *Board of Education,* 373 U. S. 683; *Watson* v. *City of Memphis,* 373 U. S. 526; *Lombard* v. *Louisiana,* 373 U. S. 267; *Peterson* v. *City of Greenville,* 373 U. S. 244; *Johnson* v. *Virginia,* 373 U. S. 61; *Turner* v. *City of Memphis,* 369 U. S. 350; *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715; *Boynton* v. *Virginia,* 364 U. S. 454; *Gomillion* v. *Lightfoot,* 364 U. S. 339; *Cooper* v. *Aaron,* 358 U. S. 1. As Professor Freund has observed, *Brown* and the decisions that followed it "were not an abrupt departure in constitutional law or a novel interpretation of the guarantee of equal protection of the laws. The old doctrine of separate-but-equal, announced in 1896, had been steadily eroded for at least a generation before the school cases, in the way that precedents are whittled down until they finally collapse." Freund, The Supreme Court of the United States (1961), p. 173. See, *e. g., Missouri ex rel. Gaines* v. *Canada,* 305 U. S. 337; *Sweatt* v. *Painter,* 339 U. S. 629; *McLaurin* v. *Oklahoma State Regents,* 339 U. S. 637.

is color blind and to the Court's decision in *Brown* v. *Board of Education,* which affirmed the right of all Americans to public equality. We cannot blind ourselves to the consequences of a constitutional interpretation which would permit citizens to be turned away by all the restaurants, or by the only restaurant, in town. The denial of the constitutional right of Negroes to access to places of public accommodation would perpetuate a caste system in the United States.

The Thirteenth, Fourteenth and Fifteenth Amendments do not permit Negroes to be considered as second-class citizens in any aspect of our public life. Under our Constitution distinctions sanctioned by law between citizens because of race, ancestry, color or religion "are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Hirabayashi* v. *United States,* 320 U. S. 81, 100. We make no racial distinctions between citizens in exacting from them the discharge of public responsibilities: The heaviest duties of citizenship—military service, taxation, obedience to laws—are imposed evenhandedly upon black and white. States may and do impose the burdens of state citizenship upon Negroes and the States in many ways benefit from the equal imposition of the duties of federal citizenship. Our fundamental law which insures such an equality of public burdens, in my view, similarly insures an equality of public benefits. This Court has repeatedly recognized and applied this fundamental principle to many aspects of community life.[3]

## III.

Of course our constitutional duty is "to construe, not to rewrite or amend, the Constitution." *Post,* at 342 (dissenting opinion of MR. JUSTICE BLACK). Our sworn duty to construe the Constitution requires, however, that

---

[3] See *supra,* note 2.

we read it to effectuate the intent and purposes of the Framers. We must, therefore, consider the history and circumstances indicating what the Civil War Amendments were in fact designed to achieve.

In 1873, in one of the earliest cases interpreting the Thirteenth and Fourteenth Amendments, this Court observed:

> "[N]o one can fail to be impressed with the one pervading purpose found in . . . all [these Amendments], lying at the foundation of each, and without which none of them would have been even suggested; we mean the freedom of the slave race, the security and firm establishment of that freedom, and the protection of the newly-made freeman and citizen from the oppressions of those who had formerly exercised unlimited dominion over him. . . ." *Slaughter-House Cases*, 16 Wall. 36, 71.

A few years later, in 1880, the Court had occasion to observe that these Amendments were written and adopted "to raise the colored race from that condition of inferiority and servitude in which most of them had previously stood, into perfect equality of civil rights with all other persons within the jurisdiction of the States." *Ex parte Virginia*, 100 U. S. 339, 344–345. In that same Term, the Court in *Strauder* v. *West Virginia*, 100 U. S. 303, 307, stated that the recently adopted Fourteenth Amendment must "be construed liberally, to carry out the purposes of its framers." Such opinions immediately following the adoption of the Amendments clearly reflect the contemporary understanding that they were "to secure to the colored race, thereby invested with the rights, privileges, and responsibilities of citizenship, the enjoyment of all the civil rights that, under the law, are enjoyed by white persons . . . ." *Neal* v. *Delaware*, 103 U. S. 370, 386.

The historical evidence amply supports the conclusion of the Government, stated by the Solicitor General in this Court, that:

> "it is an inescapable inference that Congress, in recommending the Fourteenth Amendment, expected to remove the disabilities barring Negroes from the public conveyances and places of public accommodation with which they were familiar, and thus to assure Negroes an equal right to enjoy these aspects of the public life of the community."

The subject of segregation in public conveyances and accommodations was quite familiar to the Framers of the Fourteenth Amendment.[4]   Moreover, it appears that the contemporary understanding of the general public was that freedom from discrimination in places of public accommodation was part of the Fourteenth Amendment's promise of equal protection.[5]   This view was readily

---

[4] See, *e. g.,* Cong. Globe, 38th Cong., 1st Sess., 839; Cong. Globe, 38th Cong., 1st Sess., 1156–1157; Cong. Globe, 42d Cong., 2d Sess., 381–383; 2 Cong. Rec. 4081–4082.   For the general attitude of post-Civil War Congresses toward discrimination in places of public accommodation, see Frank and Munro, The Original Understanding of "Equal Protection of the Laws," 50 Col. L. Rev. 131, 150–153 (1950).

[5] The Civil Rights Act of 1866, 14 Stat. 27, which was the precursor of the Fourteenth Amendment, did not specifically enumerate such rights but, like the Fourteenth Amendment, was nevertheless understood to open to Negroes places of public accommodation. See Flack, *op. cit., supra,* note 1, at 45 (opinion of the press); Frank and Munro, *supra,* note 4, at 150–153; Lewis, The Sit-In Cases: Great Expectations, 1963 Sup. Ct. Rev. 101, 145–146.   See also *Coger* v. *The North West. Union Packet Co.,* 37 Iowa 145; *Ferguson* v. *Gies,* 82 Mich. 358, 46 N. W. 718.   The Government, in its brief in this Court, has agreed with these authorities: "[W]e may feel sure that any member of Congress would have answered affirmatively if he had been asked in 1868 whether the Civil Rights Act of 1866 and the Fourteenth Amendment would have the effect of securing Negroes the same right as other members of the public to use hotels, trains and public conveyances."

accepted by the Supreme Court of Mississippi in 1873 in *Donnell* v. *State,* 48 Miss. 661. The Mississippi Supreme Court there considered and upheld the equal accommodations provisions of Mississippi's "civil rights" bill as applied to a Negro theater patron. Justice Simrall, speaking for the court, noted that the "13th, 14th and 15th amendments of the constitution of the United States, are the logical results of the late civil war," *id.,* at 675, and concluded that the "fundamental idea and principle pervading these amendments, is an impartial equality of rights and privileges, civil and political, to all 'citizens of the United States' . . . ," *id.,* at 677.[6]

In *Strauder* v. *West Virginia, supra,* this Court had occasion to consider the concept of civil rights embodied in the Fourteenth Amendment:

"What is this but declaring that the law in the States shall be the same for the black as for the white; that all persons, whether colored or white, shall stand equal before the laws of the States, and, in regard to the colored race, for whose protection the amendment was primarily designed, that no discrimination shall be made against them by law because of their color? The words of the amendment, it is true, are prohibitory, but they contain a necessary implication of a positive immunity, or right, most valuable to

---

[6] Justice Simrall, a Kentuckian by birth, was a plantation owner and a prominent Mississippi lawyer and Mississippi State Legislator before the Civil War. Shoftly before the war, he accepted a chair of law at the University of Louisville; he continued in that position until the beginning of the war when he returned to his plantation in Mississippi. He subsequently served for nine years on the Mississippi Supreme Court, the last three years serving as Chief Justice. He later lectured at the University of Mississippi and in 1890 was elected a member of the Constitutional Convention of Mississippi and served as chairman of the judiciary committee. 5 National Cyclopædia of American Biography (1907), 456; 1 Rowland, Courts, Judges, and Lawyers of Mississippi 1798–1935 (1935), 98–99.

the colored race,—the right to exemption from unfriendly legislation against them distinctively as colored,—exemption from legal discriminations, implying inferiority in civil society, lessening the security of their enjoyment of the rights which others enjoy, and discriminations which are steps towards reducing them to the condition of a subject race." *Id.,* at 307–308.

.    .    .    .    .

"*The Fourteenth Amendment makes no attempt to enumerate the rights it designed to protect.* It speaks in general terms, and those are as comprehensive as possible. Its language is prohibitory; but every prohibition implies the existence of rights and immunities, prominent among which is an immunity from inequality of legal protection, either for life, liberty, or property." *Id.,* at 310. (Emphasis added.)

The Fourteenth Amendment was in part designed to provide a firm constitutional basis for the Civil Rights Act of 1866, 14 Stat. 27, and to place that legislation beyond the power of congressional repeal.[7] The origins of subsequently proposed amendments and legislation lay in the 1866 bill and in a companion measure, the Freed-

---

[7] Cong. Globe, 39th Cong., 1st Sess., at 2459, 2462, 2465, 2467, 2538; Flack, *op. cit., supra,* note 1, at 94; Harris, *op. cit., supra,* note 1, at 30–40; McKitrick, Andrew Johnson and Reconstruction (1960), 326–363; Gressman, The Unhappy History of Civil Rights Legislation, 50 Mich. L. Rev. 1323, 1328–1332 (1952). A majority of the courts that considered the Act of 1866 had accepted its constitutionality. *United States* v. *Rhodes,* 27 Fed. Cas. 785 (No. 16,151); *In re Turner,* 24 Fed. Cas: 337 (No. 14,247); *Smith* v. *Moody,* 26 Ind. 299; *Hart* v. *Hoss & Elder,* 26 La. Ann. 90. Contra, *People* v. *Brady,* 40 Cal. 198 (compare *People* v. *Washington,* 36 Cal. 658); *Bowlin* v. *Commonwealth,* 65 Ky. 5.

men's Bureau bill.[8] The latter was addressed to States "wherein, in consequence of any State or local law, . . . custom, or prejudice, any of the civil rights or immunities belonging to white persons, including the right . . . to have full and equal benefit of all laws and proceedings for the security of person and estate, are refused or denied to negroes . . . ." Cong. Globe., 39th Cong., 1st Sess., 318. A review of the relevant congressional debates reveals that the concept of civil rights which lay at the heart both of the contemporary legislative proposals and of the Fourteenth Amendment encompassed the right to equal treatment in public places—a right explicitly recognized to be a "civil" rather than a "social" right. It was repeatedly emphasized "that colored persons shall enjoy the same civil rights as white persons," [9] that the colored man should have the right "to go where he pleases," [10] that he should have "practical" free-

---

[8] As MR. JUSTICE BLACK pointed out in the Appendix to his dissent in *Adamson* v. *California,* 332 U. S. 46, 68, 107–108:

"Both proponents and opponents of § 1 of the [Fourteenth] amendment spoke of its relation to the Civil Rights Bill which had been previously passed over the President's veto. Some considered that the amendment settled any doubts there might be as to the constitutionality of the Civil Rights Bill. Cong. Globe, [39th Cong., 1st Sess.,] 2511, 2896. Others maintained that the Civil Rights Bill would be unconstitutional unless and until the amendment was adopted. Cong. Globe, 2461, 2502, 2506, 2513, 2961. Some thought that amendment was nothing but the Civil Rights [Bill] 'in another shape.' Cong. Globe, 2459, 2462, 2465, 2467, 2498, 2502."

[9] Cong. Globe, 39th Cong., 1st Sess., at 684 (Senator Sumner).

[10] *Id.,* at 322 (Senator Trumbull). The recurrent references to the right "to go and come at pleasure" as being "among the natural rights of free men" reflect the common understanding that the concepts of liberty and citizenship embraced the right to freedom of movement, the effective right to travel freely. See *id.,* at 41–43, 111, 475. Blackstone had stated that the "personal liberty of individuals" embraced "the power of locomotion, of changing situation, or moving one's per-

dom,[11] and that he should share "the rights and guarantees of the good old common law." [12]

In the debates that culminated in the acceptance of the Fourteenth Amendment, the theme of granting "civil," as distinguished from "social," rights constantly recurred.[13] Although it was commonly recognized that in some areas the civil-social distinction was misty, the critical fact is that it was generally understood that "civil rights" certainly included the right of access to places of public accommodation for these were most clearly places and areas of life where the relations of men were traditionally regulated by governments.[14] Indeed, the opponents both

---

son to whatsoever place one's own inclination may direct, without imprisonment or restraint, unless by due course of law." 1 Blackstone, Commentaries (Lewis ed. 1902), 134. This heritage was correctly described in *Kent* v. *Dulles*, 357 U. S. 116, 125–127:

"The right to travel is a part of the 'liberty' of which the citizen cannot be deprived without due process of law under the Fifth [and Fourteenth Amendments]. . . . In Anglo-Saxon law that right was emerging at least as early as the Magna Carta. . . . Freedom of movement across frontiers in either direction, and inside frontiers as well, was a part of our heritage. Travel abroad, like travel within the country, may be necessary for a livelihood. It may be as close to the heart of the individual as the choice of what he eats, or wears, or reads. Freedom of movement is basic in our scheme of values. See *Crandall* v. *Nevada*, 6 Wall. 35, 44; *Williams* v. *Fears*, 179 U. S. 270, 274; *Edwards* v. *California*, 314 U. S. 160." See also *Aptheker* v. *Secretary of State, post*, p. 500.

This right to move freely has always been thought to be and is now more than ever inextricably linked with the right of the citizen to be accepted and to be treated equally in places of public accommodation. See the opinion of MR. JUSTICE DOUGLAS, *ante*, at 250–251.

[11] Cong. Globe, 39th Cong., 1st Sess., at 474 (Senator Trumbull).

[12] *Id.*, at 111 (Senator Wilson). See *infra*, at note 17.

[13] *E. g., id.*, at 476, 599, 606, 1117–1118, 1151, 1157, 1159, 1264.

[14] Frank and Munro, *supra*, note 4, at 148–149: "One central theme emerges from the talk of 'social equality': there are two kinds of relations of men, those that are controlled by the law and those that are

of the Freedmen's Bureau bill and of the Civil Rights Act of 1866 frequently complained, without refutation or contradiction, that these measures would grant Negroes the right to equal treatment in places of public accommodation. Thus, for example, Senator Davis of Kentucky, in opposing the Freedmen's Bureau bill, protested that "commingling with [white persons] in hotels, theaters, steamboats, and *other* civil rights and privileges, were always forbid to free negroes, until . . ." recently granted by Massachusetts.[15]

An 1873 decision of the Supreme Court of Iowa clearly reflects the contemporary understanding of the meaning of the Civil Rights Act of 1866. In *Coger* v. *North West. Union Packet Co.*, 37 Iowa 145, a colored woman sought damages for assault and battery occurring when the officers of a Mississippi River steamboat ordered that she be removed from a dining table in accordance with a practice of segregation in the main dining room on the boat. In giving judgment for the plaintiff, the Iowa Supreme Court quoted the Civil Rights Act of 1866 and concluded that:

> "Under this statute, equality in rights is secured to the negro. The language is comprehensive and includes the right to property and all rights growing out of contracts. It includes within its broad terms every right arising in the affairs of life. The right of the passenger under the contract of transportation with the carrier is included therein. The colored man is guarantied equality and equal protec-

---

controlled by purely personal choice. The former involves civil rights, the latter social rights. There are statements by proponents of the Amendment from which a different definition could be taken, but this seems to be the usual one." See *infra*, at notes 16, 32.

[15] Cong. Globe, 39th Cong., 1st Sess., 936. (Emphasis added.) See also *id..* at 541, 916, App. 70.

tion of the laws with his white neighbor. These are the rights secured to him as a citizen of the United States, without regard to his color, and constitute his privileges, which are secured by [the Fourteenth Amendment]." *Id.*, at 156.

The Court then went on to reject the contention that the rights asserted were "social, and . . . not, therefore, secured by the constitution and statutes, either of the State or of the United States." *Id.*, at 157.[16]

Underlying the congressional discussions, and at the heart of the Fourteenth Amendment's guarantee of equal protection, was the assumption that the State by statute or by "the good old common law" was obligated to guarantee all citizens access to places of public accommodation. This obligation was firmly rooted in ancient

---

[16] The court continued: "Without doubting that social rights and privileges are not within the protection of the laws and constitutional provisions in question, we are satisfied that the rights and privileges which were denied plaintiff are not within that class. She was refused accommodations equal to those enjoyed by white passengers. . . . She was unobjectionable in deportment and character. . . . She complains not because she was deprived of the society of white persons. Certainly no one will claim that the passengers in the cabin of a steamboat are there in the character of members of what is called society. Their companionship as travelers is not esteemed by any class of our people to create social relations. . . . The plaintiff . . . claimed no social privilege, but substantial privileges pertaining to her property and the protection of her person. It cannot be doubted that she was excluded from the table and cabin . . . because of prejudice entertained against her race . . . . The object of the amendments of the federal constitution and of the statutes above referred to, is to relieve citizens of the black race from the effects of this prejudice, to protect them in person and property from its spirit. *The Slaughter House Cases* [16 Wall. 36]. We are disposed to construe these laws according to their very spirit and intent, so that equal rights and equal protection shall be secured to all regardless of color or nationality." *Id.*, at 157–158. See also *Ferguson* v. *Gies*, 82 Mich. 358, 46 N. W. 718.

Anglo-American tradition. In his work on bailments, Judge Story spoke of this tradition:

> "An innkeeper is bound . . . to take in all travellers and wayfaring persons, and to entertain them, if he can accommodate them, for a reasonable compensation; and he must guard their goods with proper diligence. . . . If an innkeeper improperly refuses to receive or provide for a guest, he is liable to be indicted therefor. . . ." Story, Commentaries on the Law of Bailments (Schouler, 9th ed., 1878) § 476.[17]

   .      .      .      .      .

---

[17] The treatise defined an innkeeper as "the keeper of a common inn for the lodging and entertainment of travellers and passengers . . . ." Story, Commentaries on the Law of Bailments (Schouler, 9th ed., 1878), § 475. 3 Blackstone, op. cit., supra, note 10, at 166, stated a more general rule:

"[I]f an inn-keeper, or other victualler, hangs out a sign and opens his house for travelers, it is an implied engagement to entertain all persons who travel that way; and upon this universal assumpsit an action on the case will lie against him for damages if he, without good reason, refuses to admit a traveler." (Emphasis added.) In Tidswell, The Innkeeper's Legal Guide (1864), p. 22, a "victualling house" is defined as a place "where people are provided with food and liquors, but not with lodgings," and in 3 Stroud, Judicial Dictionary (1903), as "a house where persons are provided with victuals, but without lodging."

Regardless, however, of the precise content of state common-law rules and the legal status of restaurants at the time of the adoption of the Fourteenth Amendment, the spirit of the common law was both familiar and apparent. In 1701 in Lane v. Cotton, 12 Mod. 472, 484–485, Holt, C. J., had declared:

"[W]herever any subject takes upon himself a public trust for the benefit of the rest of his fellow-subjects, he is eo ipso bound to serve the subject in all the things that are within the reach and comprehension of such an office, under pain of an action against him . . . . If on the road a shoe fall off my horse, and I come to a smith to have one put on, and the smith refuse to do it, an action will lie against him, because he has made profession of a trade which

"The first and most general obligation on [carriers of passengers] is to carry passengers whenever they offer themselves, and are ready to pay for their transportation. This results from their setting themselves up, like innkeepers, and common carriers of goods, for a common public employment on hire. They are no more at liberty to refuse a passenger, if they have sufficient room and accommodations, than an innkeeper is to refuse suitable room and accommodations to a guest. . . ." *Id.,* at §§ 590, 591.

It was in this vein that the Supreme Court of Mississippi spoke when in 1873 it applied the equal accommodations

is for the public good, and has thereby exposed and vested an interest of himself in all the king's subjects that will employ him in the way of his trade. If an innkeeper refuse to entertain a guest where his house is not full, an action will lie against him, and so against a carrier, if his horses be not loaded, and he refuse to take a packet proper to be sent by a carrier . . . . If the inn be full, or the carrier's horses laden, the action would not lie for such refusal; but one that has made profession of a public employment, is bound to the utmost extent of that employment to serve the public." See *Munn* v. *Illinois,* 94 U. S. 113, 126–130 (referring to the duties traditionally imposed on one who pursues a public employment and exercises "a sort of public office").

Furthermore, it should be pointed out that the Framers of the Fourteenth Amendment, and the men who debated the Civil Rights Acts of 1866 and 1875, were not thinking only in terms of existing common-law duties but were thinking more generally of the customary expectations of white citizens with respect to places which were considered public and which were in various ways regulated by laws. See *infra,* at 298–305. Finally, as the Court acknowledged in *Strauder* v. *West Virginia,* 100 U. S. 303, 310, the "Fourteenth Amendment makes no attempt to enumerate the rights it designed to protect," for those who adopted it were conscious that a constitutional "principle to be vital must be capable of wider application than the mischief which gave it birth." *Weems* v. *United States,* 217 U. S. 349, 373. See *infra,* at 315.

provisions of the State's civil rights bill to a Negro refused admission to a theater:

> "Among those customs which we call the common law, that have come down to us from the remote past, are rules which have a special application to those who sustain a *quasi* public relation to the community. The wayfarer and the traveler had a right to demand food and lodging from the inn-keeper; the common carrier was bound to accept all passengers and goods offered for transportation, according to his means. So, too, all who applied for admission to the public shows and amusements, were entitled to admission, and in each instance, for a refusal, an action on the case lay, unless sufficient reason were shown. The statute deals with subjects which have always been under legal control." *Donnell* v. *State,* 48 Miss. 661, 680–681.

In a similar manner, Senator Sumner, discussing the Civil Rights Act of 1875, referred to and quoted from Holingshed, Story, Kent and Parsons on the common-law duties of innkeepers and common carriers to treat all alike. Cong. Globe, 42d Cong., 2d Sess., 382–383. With regard to "theaters and places of public amusement," the Senator observed that:

> "Theaters and other places of public amusement, licensed by law, are kindred to inns or public conveyances, though less noticed by jurisprudence. But, like their prototypes, they undertake to provide for the public under sanction of law. They are public institutions, regulated if not created by law, enjoying privileges, and in consideration thereof, assuming duties not unlike those of the inn and the public conveyance. From essential reason, the rule should be the same with all. As the inn cannot close its

doors, or the public conveyance refuse a seat to any paying traveler, decent in condition, so must it be with the theater and other places of public amusement. Here are institutions whose peculiar object is the 'pursuit of happiness,' which has been placed among the equal rights of all." *Id.*, at 383.[18]

The first sentence of § 1 of the Fourteenth Amendment, the spirit of which pervades all the Civil War Amend-

---

[18] Similarly, in 1874, Senator Pratt said:

"No one reading the Constitution can deny that every colored man is a citizen, and as such, so far as legislation may go, entitled to equal rights and privileges with white people. Can it be doubted that for a denial of any of the privileges or accommodations enumerated in the bill [proposed supplement to the Civil Rights Act of 1866] he could maintain a suit at common law against the inn-keeper, the public carrier, or proprietor or lessee of the theater who withheld them? Suppose a colored man presents himself at a public inn, kept for the accommodation of the public, is decently clad and behaves himself well and is ready to pay the customary charges for rest and refreshment, and is either refused admittance or treated as an inferior guest—placed at the second table and consigned to the garret, or compelled to make his couch upon the floor—does any one doubt that upon an appeal to the courts, the law if justly administered would pronounce the inn-keeper responsible to him in damages for the unjust discrimination? I suppose not. Prejudice in the jury-box might deny him substantial damages; but about the law in the matter there can be no two opinions. The same is true of public carriers on land or water. Their engagement with the public is to carry all persons who seek conveyance on their cars or boats to the extent of their facilities for certain established fares, and all persons who behave themselves and are not afflicted with any contagious disease are entitled to equal accommodations where they pay equal fares.

"But it is asked, if the law be as you lay it down, where the necessity for this legislation, since the courts are open to all? My answer is, that the remedy is inadequate and too expensive, and involves too much loss of time and patience to pursue it. When a man is traveling, and far from home, it does not pay to sue every inn-keeper who, or railroad company which, insults him by unjust discrimination. Practically the remedy is worthless." 2 Cong. Rec. 4081–4082.

ments, was obviously designed to overrule *Dred Scott* v. *Sandford*, 19 How. 393, and to ensure that the constitutional concept of citizenship with all attendant rights and privileges would henceforth embrace Negroes. It follows that Negroes as citizens necessarily became entitled to share the right, customarily possessed by other citizens, of access to public accommodations. The history of the affirmative obligations existing at common law serves partly to explain the negative—"deny to any person"—language of the Fourteenth Amendment. For it was assumed that under state law, when the Negro's disability as a citizen was removed, he would be assured the same public civil rights that the law had guaranteed white persons. This view pervades the opinion of the Supreme Court of Michigan in *Ferguson* v. *Gies*, 82 Mich. 358, 46 N. W. 718, decided in 1890. That State had recently enacted a statute prohibiting the denial to any person, regardless of race, of "the full and equal accommodations . . . and privileges of . . . restaurants . . . and all other places of public accommodation and amusement . . . ." [19] A Negro plaintiff brought an action for damages arising from the refusal of a restaurant owner to serve him at a row of tables reserved for whites. In upholding the plaintiff's claim, the Michigan court observed:

> "The negro is now, by the Constitution of the United States, given full citizenship with the white man, and all the rights and privileges of citizenship attend him wherever he goes. Whatever right a white man

---

[19] The statute specifically referred to "the full and equal accommodations, advantages, facilities, and privileges of inns, restaurants, eating-houses, barber-shops, public conveyances on land and water, theaters, and all other places of public accommodation and amusement, subject only to the conditions and limitations established by law, and applicable alike to all citizens." 82 Mich. 358, 364, 46 N. W. 718, 720.

has in a public place, the black man has also, because of such citizenship." *Id.,* at 364, 46 N. W., at 720.

The court then emphasized that in light of this constitutional principle the same result would follow whether the claim rested on a statute or on the common law:

"The common law as it existed in this State before the passage of this statute, and before the colored man became a citizen under our Constitution and laws, gave to the white man a remedy against any unjust discrimination to the citizen in all public places. It must be considered that, when this suit was planted, the colored man, under the common law of this State, was entitled to the same rights and privileges in public places as the white man, and he must be treated the same there; and that his right of action for any injury arising from an unjust discrimination against him is just as perfect and sacred in the courts as that of any other citizen. This statute is only declaratory of the common law, as I understand it now to exist in this State." *Id.,* at 365, 46 N. W., at 720.[20]

Evidence such as this demonstrates that Mr. Justice Harlan, dissenting in the *Civil Rights Cases,* 109 U. S. 3, 26, was surely correct when he observed:

"But what was secured to colored citizens of the United States—as between them and their respective States—by the national grant to them of State citizenship? With what rights, privileges, or immunities did this grant invest them? There is one, if there be no other—exemption from race discrimination in respect of any civil right belonging to citizens of the

---

[20] The court also emphasized that the right under consideration was clearly a "civil" as distinguished from a "social" right. See 82 Mich., at 363, 367–368, 46 N. W., at 720–721; see also *supra,* at notes 13–14, 16 and *infra,* at note 32.

white race in the same State. That, surely, is their constitutional privilege when within the jurisdiction of other States. And such must be their constitutional right, in their own State, unless the recent amendments be splendid baubles, thrown out to delude those who deserved fair and generous treatment at the hands of the nation. Citizenship in this country necessarily imports at least equality of civil rights among citizens of every race in the same State. It is fundamental in American citizenship that, in respect of such rights, there shall be no discrimination by the State, or its officers, or by individuals or corporations exercising public functions or authority, against any citizen because of his race or previous condition of servitude." *Id.*, at 48.

The Framers of the Fourteenth Amendment, reacting against the Black Codes,[21] made certain that the States could not frustrate the guaranteed equality by enacting discriminatory legislation or by sanctioning discriminatory treatment. At no time in the consideration of the Amendment was it suggested that the States could achieve the same prohibited result by withdrawing the traditional right of access to public places. In granting Negroes citizenship and the equal protection of the laws, it was never thought that the States could permit the proprietors of inns and public places to restrict their general invitation to the public and to citizens in order to exclude

---

[21] After the Civil War, Southern States enacted the so-called "Black Codes" imposing disabilities reducing the emancipated Negroes to the status of "slaves of society," even though they were no longer the chattels of individual masters. See Cong. Globe, 39th Cong., 1st Sess., 39, 516–517; opinion of MR. JUSTICE DOUGLAS, *ante*, at 247, n. 3. For the substance of these codes, see 1 Fleming, Documentary History of Reconstruction (1906), 273–312; McPherson, The Political History of the United States During the Period of Reconstruction (1871), 29–44.

the Negro public and Negro citizens. The Fourteenth
Amendment was therefore cast in terms under which
judicial power would come into play where the State
withdrew or otherwise denied the guaranteed protection
"from legal discriminations, implying inferiority in civil
society, lessening the security of [the Negroes'] enjoy-
ment of the rights which others enjoy . . . ." *Strauder*
v. *West Virginia*, 100 U. S., at 308.

Thus a fundamental assumption of the Fourteenth
Amendment was that the States would continue, as they
had for ages, to enforce the right of citizens freely to enter
public places. This assumption concerning the affirma-
tive duty attaching to places of public accommodation
was so rooted in the experience of the white citizenry
that law and custom blended together indistinguishably.[22]
Thus it seemed natural for the Supreme Court of Missis-
sippi, considering a public accommodations provision in
a civil rights statute, to refer to "those customs which
we call the common law, that have come down to us from
the remote past," *Donnell* v. *State,* 48 Miss., at 680,

---

[22] See Lewis, *supra,* note 5, at 146: "It was assumed by more
than a few members of Congress that theaters and places of amuse-
ment would be or could be opened to all as a result either of the
Equal Protection Clause or the Privileges and Immunities Clause.
Why would the framers believe this? Some mentioned the law's
regulation of such enterprises, but this is not enough. Some other
standard must delineate between the regulated who must offer equal
treatment and those who need not. Whites did not have a legal right
to demand admittance to [such] enterprises, but they were admitted.
Perhaps this observed conduct was confused with required conduct,
just as the observed status of the citizens of all free governments—
the governments that Washington, J., could observe—was mistaken
for inherent rights to the status. The important point is that the
framers, or some of them, believed the Amendment would open places
of public accommodation, and study of the debates reveals this belief
to be the observed expectations of the majority, tantamount in prac-
tice to legal rights. . . ."

and thus it seems significant that the various proposals for federal legislation often interchangeably referred to discriminatory acts done under "law" or under "custom." [23] In sum, then, it was understood that under the Fourteenth Amendment the duties of the proprietors of places of public accommodation would remain as they had long been and that the States would now be affirmatively obligated to insure that these rights ran to Negro as well as white citizens.

The Civil Rights Act of 1875, enacted seven years after the Fourteenth Amendment, specifically provided that all citizens must have "the full and equal enjoyment of the accommodations, advantages, facilities, and privileges of inns, public conveyances on land or water, theaters, and other places of public amusement . . . ." 18 Stat. 335. The constitutionality of this federal legislation was reviewed by this Court in 1883 in the *Civil Rights Cases*, 109 U. S. 3. The dissent in the present case purports to follow the "state action" concept articulated in that early decision. There the Court had declared that under the Fourteenth Amendment:

> "It is State action of a particular character that is prohibited. Individual invasion of individual rights is not the subject-matter of the amendment. It has a deeper and broader scope. It nullifies and makes void all State legislation, *and State action of every kind,* which impairs the privileges and immunities of citizens of the United States, or which injures them in life, liberty or property without due

[23] *E. g.*, The Supplementary Freedmen's Bureau Act, Cong. Globe, 39th Cong., 1st Sess., 318; The Civil Rights Act of 1866, 14 Stat. 27; The Enforcement Act of 1870, 16 Stat. 140; The Civil Rights Act of April 20, 1871, 17 Stat. 13; 42 U. S. C. § 1983. See also the language of the *Civil Rights Cases,* 109 U. S. 3, 17 (quoted *infra,* at note 25).

process of law, or which denies to any of them the equal protection of the laws." 109 U. S., at 11. (Emphasis added.)

Mr. Justice Bradley, writing for the Court over the strong dissent of Mr. Justice Harlan, held that a proprietor's racially motivated denial of equal access to a public accommodation did not, without more, involve state action. It is of central importance to the case at bar that the Court's decision was expressly predicated:

> "on the assumption that a right to enjoy equal accommodation and privileges in all inns, public conveyances, and places of public amusement, is one of the essential rights of the citizen which no State can abridge or interfere with." *Id.*, at 19.

The Court added that:

> "Innkeepers and public carriers, by the laws of all the States, so far as we are aware,[24] are bound, to the

---

[24] Of the five cases involved in the *Civil Rights Cases,* two concerned theatres, two concerned inns or hotels and one concerned a common carrier. In *United States* v. *Nichols* (involving a Missouri inn or hotel) the Solicitor General said: "I premise that upon the subject of inns the common law is in force in Missouri . . . ." Brief for the United States, Nos. 1, 2, 4, 460, October Term, 1882, p. 8. In *United States* v. *Ryan* (a California theatre) and in *United States* v. *Stanley* (a Kansas inn or hotel), it seems that common-law duties applied as well as state antidiscrimination laws. Calif. Laws 1897, p. 137; Kan. Laws 1874, p. 82. In *United States* v. *Singleton* (New York opera house) a state statute barred racial discrimination by "theaters, or other places of amusement." N. Y. Laws 1873, p. 303; Laws 1881, p. 541. In *Robinson* v. *Memphis* (a Tennessee railroad parlor car), the legal duties were less clear. The events occurred in 1879 and the trial was held in 1880. The common-law duty of carriers had existed in Tennessee and, from what appears in the record, was assumed by the trial judge, in charging the jury, to exist at the time of trial. However, in 1875 Tennessee had repealed the common-law rule, Laws 1875, p. 216, and in 1881 the State amended the law

extent of their facilities, to furnish proper accommodation to all unobjectionable persons who in good faith apply for them." *Id.*, at 25.[25]

This assumption, whatever its validity at the time of the 1883 decision, has proved to be unfounded. Although reconstruction ended in 1877, six years before the *Civil Rights Cases*, there was little immediate action in the South to establish segregation, in law or in fact, in places

to require a carrier to furnish separate but equal first-class accommodations, Laws 1881, p. 211.

[25] Reasoning from this same basic assumption, the Court said that Congress lacked the power to enact such legislation: "[U]ntil some State law has been passed, or some State action through its officers or agents has been taken, adverse to the rights of citizens sought to be protected by the Fourteenth Amendment, no legislation of the United States under said amendment, nor any proceeding under such legislation, can be called into activity: for the prohibitions of the amendment are against State laws and acts done under State authority." 109 U. S., at 13. And again: "[I]t is proper to state that civil rights, such as are guaranteed by the Constitution against State aggression, cannot be impaired by the wrongful acts of individuals, *unsupported by State authority in the shape of laws, customs, or judicial or executive proceedings. The wrongful act of an individual, unsupported by any such authority, is simply a private wrong*, or a crime of that individual; an invasion of the rights of the injured party, it is true . . . ; but if not sanctioned in some way by the State . . . his rights remain in full force, *and may presumably be vindicated by resort to the laws of the State for redress." Id.*, at 17. (Emphasis added.)

The argument of the Attorney General of Mississippi in *Donnell* v. *State*, 48 Miss. 661, explicitly related the State's new public accommodations law to the Thirteenth and Fourteenth Amendments. He stated that the Amendments conferred a national "power to enforce, 'by appropriate legislation,' these rights, privileges and immunities of citizenship upon the newly enfranchised class . . ."; he then concluded that "the legislature of this state has sought, by this [anti-discrimination] act, to render any interference by congress unnecessary." *Id.*, at 668. This view seems to accord with the assumption underlying the *Civil Rights Cases*.

of public accommodation.[26]   This benevolent, or perhaps passive, attitude endured about a decade and then in the late 1880's States began to enact laws mandating unequal treatment in public places.[27]   Finally, three-quarters of a century later, after this Court declared such legislative action invalid, some States began to utilize and make available their common law to sanction similar discriminatory treatment.

A State applying its statutory or common law [28] to deny rather than protect the right of access to public accommodations has clearly made the assumption of the opin-

[26] Woodward, The Strange Career of Jim Crow (1955), 15–26, points out that segregation in its modern and pervasive form is a relatively recent phenomenon.   Although the speed of the movement varied, it was not until 1904, for example, that Maryland, the respondent in this case, extended Jim Crow legislation to railroad coaches and other common carriers.   Md. Laws 1904, c. 110, p. 188; Md. Laws 1908, c. 248, p. 88.   In the 1870's Negroes in Baltimore, Maryland, successfully challenged attempts to segregate transit facilities.   See *Fields* v. *Baltimore City Passenger R. Co.*, reported in Baltimore American, Nov. 14, 1871, p. 4, col. 3; Baltimore Sun, Nov. 13, 1871, p. 4, col. 2.

[27] Not until 1887 did Florida, the appellee in *Robinson* v. *Florida, ante*, at 153, enact a statute requiring separate railroad passenger facilities for the two races.   Fla. Laws 1887, c. 3743, p. 116.   The State, in following a pattern that was not unique, had not immediately repealed its reconstruction antidiscrimination statute.   Fla. Digest 1881, c. 19, pp. 171–172; see Fla. Laws 1891, c. 4055, p. 92; Fla. Rev. Stat. 1892, p. viii.

[28] This Court has frequently held that rights and liberties protected by the Fourteenth Amendment prevail over state common-law, as well as statutory, rules.   "The fact that [a State's] policy is expressed by the judicial organ . . . rather than by the legislature we have repeatedly ruled to be immaterial. . . . '[R]ights under [the Fourteenth] amendment turn on the power of the State, no matter by what organ it acts.' *Missouri* v. *Dockery,* 191 U. S. 165, 170–71." *Hughes* v. *Superior Court,* 339 U. S. 460, 466–467.   See also *Ex parte Virginia,* 100 U. S. 339, 346–347; *American Federation of Labor* v. *Swing,* 312 U. S. 321; *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 265.

ion in the *Civil Rights Cases* inapplicable and has, as the author of that opinion would himself have recognized, denied the constitutionally intended equal protection. Indeed, in light of the assumption so explicitly stated in the *Civil Rights Cases*, it is significant that Mr. Justice Bradley, who spoke for the Court, had earlier in correspondence with Circuit Judge Woods expressed the view that the Fourteenth Amendment "not only prohibits the making or enforcing of laws which shall abridge the privileges of the citizen; but prohibits the states from denying to all persons within its jurisdiction the equal protection of the laws." [29]  In taking this position, which is consistent with his opinion and the assumption in the *Civil Rights Cases*,[30] he concluded that: "Denying includes inaction as well as action. And denying the equal protection of the laws includes the omission to protect, as well as the omission

---

[29] Letter from Justice Bradley to Circuit Judge (later Justice) William B. Woods (unpublished draft), Mar. 12, 1871, in the Bradley Papers on file, The New Jersey Historical Society, Newark, New Jersey; Supplemental Brief for the United States as Amicus Curiae, Nos. 6, 9, 10, 12 and 60, October Term, 1963, pp. 75–76. For a convenient source of excerpts, see Roche, Civil Liberty in the Age of Enterprise, 31 U. of Chi. L. Rev. 103, 108–110 (1963). See notes 30–31, *infra*.

[30] A comparison of the 1871 Bradley-Woods correspondence (and the opinion that Judge Woods later wrote, see note 31, *infra*) with Justice Bradley's 1883 opinion in the *Civil Rights Cases* indicates that in some respects the Justice modified his views. Attached to a draft of a letter to Judge Woods was a note, apparently written subsequently, by Justice Bradley stating that: "The views expressed in the foregoing letters were much modified by subsequent reflection, so far as relates to the power of Congress to pass laws for enforcing social equality between the races." The careful wording of this note, limiting itself to "the power of Congress to pass laws," supports the conclusion that Justice Bradley had only modified, not abandoned, his fundamental views and that the *Civil Rights Cases* should be read, as they were written, to rest on an explicit assumption as to the legal rights which the States were affirmatively protecting.

to pass laws for protection." [31]   These views are fully consonant with this Court's recognition that state conduct which might be described as "inaction" can nevertheless

---

[31] The background of this correspondence and the subsequent opinion of Judge Woods in *United States* v. *Hall,* 26 Fed. Cas. 79 (Cas. No. 15,282), are significant. The correspondence on the subject apparently began in December 1870 when Judge Woods wrote Justice Bradley concerning the constitutional questions raised by an indictment filed by the United States under the Enforcement Act of 1870, 16 Stat. 140. The indictment charged that the defendants "did unlawfully and feloniously band and conspire together, with intent to injure, oppress, threaten and intimidate" certain citizens in their exercise of their "right of freedom of speech" and in "their free exercise and enjoyment of the right and privilege to peaceably assemble." The prosecution was instituted in a federal court in Alabama against private individuals whose conduct had in no way involved or been sanctioned by state action.

In May of 1871, after corresponding with Justice Bradley, Judge Woods delivered an opinion upholding the federal statute and the indictment. The judge declared that the rights allegedly infringed were protected under the Privileges and Immunities Clause of the Fourteenth Amendment: "We think . . . that the right of freedom of speech, and the other rights enumerated in the first eight articles of amendment to the constitution of the United States, are the privileges and immunities of citizens of the United States, that they are secured by the constitution . . . ." 26 Fed. Cas., at 82. This position is similar to that of Justice Bradley two years later dissenting in the *Slaughter-House Cases,* 16 Wall. 36, 111, 118–119. More important for present purposes, however, is the fact that in analyzing the problem of "private" (nonstate) action, Judge Woods' reasoning and language follow that of Justice Bradley's letters. The judge concluded that under the Fourteenth Amendment Congress could adopt legislation: "to protect the fundamental rights of citizens of the United States against unfriendly or insufficient state legislation, for the fourteenth amendment not only prohibits the making or enforcing of laws which shall abridge the privileges of the citizen, but prohibits the states from denying to all persons within its jurisdiction the equal protection of the laws. Denying includes inaction as well as action, and denying the equal protection of the laws includes the omission to protect, as well as the omission to pass laws for protection." 26 Fed. Cas., at 81.

constitute responsible "state action" within the meaning of the Fourteenth Amendment. See, *e. g., Marsh* v. *Alabama,* 326 U. S. 501; *Shelley* v. *Kraemer,* 334 U. S. 1; *Terry* v. *Adams,* 345 U. S. 461; *Barrows* v. *Jackson,* 346 U. S. 249.

In the present case the responsibility of the judiciary in applying the principles of the Fourteenth Amendment is clear. The State of Maryland has failed to protect petitioners' constitutional right to public accommodations and is now prosecuting them for attempting to exercise that right. The decision of Maryland's highest court in sustaining these trespass convictions cannot be described as "neutral," for the decision is as affirmative in effect as if the State had enacted an unconstitutional law explicitly authorizing racial discrimination in places of public accommodation. A State, obligated under the Fourteenth Amendment to maintain a system of law in which Negroes are not denied protection in their claim to be treated as equal members of the community, may not use its criminal trespass laws to frustrate the constitutionally granted right. Nor, it should be added, may a State frustrate this right by legitimating a proprietor's attempt at self-help. To permit self-help would be to disregard the principle that "[t]oday, no less than 50 years ago, the solution to the problems growing out of race relations 'cannot be promoted by depriving citizens of their constitutional rights and privileges,' *Buchanan* v. *Warley* . . . 245 U. S., at 80–81." *Watson* v. *City of Memphis,* 373 U. S. 526, 539. As declared in *Cooper* v. *Aaron,* 358 U. S. 1, 16, "law and order are not . . . to be preserved by depriving the Negro . . . of [his] constitutional rights."

In spite of this, the dissent intimates that its view best comports with the needs of law and order. Thus it is said: "It would betray our whole plan for a tranquil and orderly society to say that a citizen, because of his per-

sonal prejudices, habits, attitudes, or beliefs, is cast outside the law's protection and cannot call for the aid of officers sworn to uphold the law and preserve the peace." *Post,* at 327–328. This statement, to which all will readily agree, slides over the critical question: Whose conduct is entitled to the "law's protection"? Of course every member of this Court agrees that law and order must prevail; the question is whether the weight and protective strength of law and order will be cast in favor of the claims of the proprietors or in favor of the claims of petitioners. In my view the Fourteenth Amendment resolved this issue in favor of the right of petitioners to public accommodations and it follows that in the exercise of that constitutionally granted right they are entitled to the "law's protection." Today, as long ago, "[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws . . . ." *Marbury* v. *Madison,* 1 Cranch 137, 163.

## IV.

My Brother Douglas convincingly demonstrates that the dissent has constructed a straw man by suggesting that this case involves "a property owner's right to choose his social or business associates." *Post,* at 343. The restaurant involved in this case is concededly open to a large segment of the public. Restaurants such as this daily open their doors to millions of Americans. These establishments provide a public service as necessary today as the inns and carriers of Blackstone's time. It should be recognized that the claim asserted by the Negro petitioners concerns such public establishments and does not infringe upon the rights of property owners or personal associational interests.

Petitioners frankly state that the "extension of constitutional guarantees to the authentically private choices of man is wholly unacceptable, and any constitutional

theory leading to that result would have reduced itself to absurdity." Indeed, the constitutional protection extended to privacy and private association assures against the imposition of social equality. As noted before, the Congress that enacted the Fourteenth Amendment was particularly conscious that the "civil" rights of man should be distinguished from his "social" rights.[32] Prejudice and bigotry in any form are regrettable, but it is the constitutional right of every person to close his home or club to any person or to choose his social intimates and business partners solely on the basis of personal prejudices including race. These and other rights pertaining to privacy and private association are themselves constitutionally protected liberties.

We deal here, however, with a claim of equal access to public accommodations. This is not a claim which significantly impinges upon personal associational interests; nor is it a claim infringing upon the control of private property not dedicated to public use. A judicial ruling on this claim inevitably involves the liberties and free-

---

[32] The approach is reflected in the reasoning stated by the Supreme Court of Michigan in 1890:

"Socially people may do as they please within the law, and whites may associate together, as may blacks, and exclude whom they please from their dwellings and private grounds; but there can be no separation in public places between people on account of their color alone which the law will sanction.

.      .      .      .

"The man who goes either by himself or with his family to a public place must expect to meet and mingle with all classes of people. He cannot ask, to suit his caprice or prejudice or social views, that this or that man shall be excluded because he does not wish to associate with them. He may draw his social line as closely as he chooses at home, or in other private places, but he connot [sic] in a public place carry the privacy of his home with him, or ask that people not as good or great as he is shall step aside when he appears." *Ferguson v. Gies*, 82 Mich., at 363, 367–368, 46 N. W., at 720, 721. See *supra*, at notes 13–14.

doms both of the restaurant proprietor and of the Negro citizen. The dissent would hold in effect that the restaurant proprietor's interest in choosing customers on the basis of race is to be preferred to the Negro's right to equal treatment by a business serving the public. The history and purposes of the Fourteenth Amendment indicate, however, that the Amendment resolves this apparent conflict of liberties in favor of the Negro's right to equal public accommodations. As the Court said in *Marsh* v. *Alabama,* 326 U. S. 501, 506: "The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it." [33] The broad acceptance of the public in this and in other restaurants clearly demonstrates that the proprietor's interest in private or unrestricted association is slight.[34] The relationship between the modern innkeeper or restaurateur and the customer is relatively impersonal and evanescent. This is highlighted by cases such as *Barr* v. *City of Columbia, ante,* at. 146, *Bouie* v. *City of Columbia, post,* at 347, and *Robinson* v. *Florida, ante,* at 153, in which Negroes are invited into all departments of the store but nonetheless ordered, in the name of private association or property rights, not to purchase and eat food, as other customers do, on the premises. As the history of the common law

---

[33] Cf. *Munn* v. *Illinois,* 94 U. S. 113, 125–126: "Looking, then, to the common law, from whence came the [property] right which the Constitution protects, we find that when private property is 'affected with a public interest, it ceases to be *juris privati* only.' This was said by Lord Chief Justice Hale more than two hundred years ago, in his treatise *De Portibus Maris,* 1 Harg. Law Tracts, 78, and has been accepted without objection as an essential element in the law of property ever since. Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large."

[34] See Lewis, *supra,* note 5, at 148.

and, indeed, of our own times graphically illustrates, the interests of proprietors of places of public accommodation have always been adapted to the citizen's felt need for public accommodations, a need which is basic and deep-rooted. This history and the purposes of the Fourteenth Amendment compel the conclusion that the right to be served in places of public accommodation regardless of color cannot constitutionally be subordinated to the proprietor's interest in discriminatorily refusing service.

Of course, although the present case involves the right to service in a restaurant, the fundamental principles of the Fourteenth Amendment apply with equal force to other places of public accommodation and amusement. Claims so important as those presented here cannot be dismissed by asserting that the Fourteenth Amendment, while clearly addressed to inns and public conveyances, did not contemplate lunch counters and soda fountains. Institutions such as these serve essentially the same needs in modern life as did the innkeeper and the carrier at common law.[35] It was to guard against narrow conceptions that Chief Justice Marshall admonished the Court never to forget "that it is *a constitution* we are expounding . . . a constitution intended to endure for ages to come, and, consequently, to be adapted to the various *crises* of human affairs." *McCulloch* v. *Maryland,* 4 Wheat. 316, 407, 415. Today, as throughout the history of the Court, we should remember that "in determining whether a provision of the Constitution applies to a new subject matter, it is of little significance that it is one with which the framers were not familiar. For in setting up an enduring framework of government they undertook to carry out for the indefinite future and in all the vicissitudes of the changing affairs of men, those fundamental purposes which the instrument itself discloses." *United States* v. *Classic,* 313 U. S. 299, 316.

[35] See *supra,* at note 17.

## V.

In my view the historical evidence demonstrates that the traditional rights of access to places of public accommodation were quite familiar to Congressmen and to the general public who naturally assumed that the Fourteenth Amendment extended these traditional rights to Negroes. But even if the historical evidence were not as convincing as I believe it to be, the logic of *Brown* v. *Board of Education,* 347 U. S. 483, based as it was on the fundamental principle of constitutional interpretation proclaimed by Chief Justice Marshall,[36] requires that petitioners' claim be sustained.

In *Brown,* after stating that the available history was "inconclusive" on the specific issue of segregated public schools, the Court went on to say:

"In approaching this problem, we cannot turn the clock back to 1868 when the Amendment was adopted, or even to 1896 when *Plessy* v. *Ferguson* was written. We must consider public education in the light of its full development and its present place in American life throughout the Nation. Only in this way can it be determined if segregation in public schools deprives these plaintiffs of the equal protection of the laws." 347 U. S., at 492–493.

The dissent makes no effort to assess the status of places of public accommodation "in the light of" their "full development and . . . present place" in the life of American citizens. In failing to adhere to that approach the dissent ignores a pervasive principle of constitutional adjudication and departs from the ultimate logic of *Brown.* As Mr. Justice Holmes so aptly said:

"[W]hen we are dealing with words that also are a constituent act, like the Constitution of the United

---

[36] See Bickel, The Original Understanding and the Segregation Decision, 69 Harv. L. Rev. 1 (1955).

States, we must realize that they have called into life a being the development of which could not have been foreseen completely by the most gifted of its begetters. It was enough for them to realize or to hope that they had created an organism; it has taken a century and has cost their successors much sweat and blood to prove that they created a nation. The case before us must be considered in the light of our whole experience and not merely in that of what was said a hundred years ago." *Missouri* v. *Holland,* 252 U. S. 416, 433.

### CONCLUSION.

The constitutional right of all Americans to be treated as equal members of the community with respect to public accommodations is a civil right granted by the people in the Constitution—a right which "is too important in our free society to be stripped of judicial protection." Cf. *Wesberry* v. *Sanders,* 376 U. S. 1, 7; *Baker* v. *Carr,* 369 U. S. 186. This is not to suggest that Congress lacks authority under § 5 of the Fourteenth Amendment, or under the Commerce Clause, Art. I, § 8, to implement the rights protected by § 1 of the Fourteenth Amendment. In the give-and-take of the legislative process, Congress can fashion a law drawing the guidelines necessary and appropriate to facilitate practical administration and to distinguish between genuinely public and private accommodations. In contrast, we can pass only on justiciable issues coming here on a case-to-case basis.

It is, and should be, more true today than it was over a century ago that "[t]he great advantage of the Americans is that . . . they are born equal" [37] and that in the eyes of the law they "are all of the same estate." The

---

[37] 2 De Tocqueville, Democracy in America (Bradley ed. 1948), 101.

first Chief Justice of the United States, John Jay, spoke of the "free air" of American life. The great purpose of the Fourteenth Amendment is to keep it free and equal. Under the Constitution no American can, or should, be denied rights fundamental to freedom and citizenship. I therefore join in reversing these trespass convictions.

MR. JUSTICE BLACK, with whom MR. JUSTICE HARLAN and MR. JUSTICE WHITE join, dissenting.

This case does not involve the constitutionality of any existing or proposed state or federal legislation requiring restaurant owners to serve people without regard to color. The crucial issue which the case does present but which the Court does not decide is whether the Fourteenth Amendment, of itself, forbids a State to enforce its trespass laws to convict a person who comes into a privately owned restaurant, is told that because of his color he will not be served, and over the owner's protest refuses to leave. We dissent from the Court's refusal to decide that question. For reasons stated, we think that the question should be decided and that the Fourteenth Amendment does not forbid this application of a State's trespass laws.

The petitioners were convicted in a Maryland state court on a charge that they "unlawfully did enter upon and cross over the land, premises and private property" of the Hooper Food Co., Inc., "after having been duly notified by Albert Warfel, who was then and there the servant and agent for Hooper Food Co.," not to do so, in violation of Maryland's criminal trespass statute.[1] The

---

[1] "Any person or persons who shall enter upon or cross over the land, premises or private property of any person or persons in this State after having been duly notified by the owner or his agent not to do so shall be deemed guilty of a misdemeanor . . . ." Md. Code, Art. 27, § 577.

conviction was based on a record showing in summary that:

> A group of fifteen to twenty Negro students, including petitioners, went to Hooper's Restaurant to engage in what their counsel describes as a "sit-in protest" because the restaurant would not serve Negroes. The hostess, on orders of Mr. Hooper, the president of the corporation owning the restaurant,[2] told them, "solely on the basis of their color," that she would not serve them. Petitioners refused to leave when requested by the hostess and the manager; instead they went to tables, took seats, and refused to leave, insisting that they be served. On orders of the owner the police were called, but they advised the manager that a warrant would be necessary before they could arrest petitioners. The manager then went to the police station and swore out the warrants. Petitioners had remained in the restaurant in all an hour and a half, testifying at their trial that they had stayed knowing they would be arrested—that being arrested was part of their "technique" in these demonstrations.

---

[2] Mr. Hooper testified this as to his reasons for adopting his policy:
"I set at the table with him and two other people and reasoned and talked to him why my policy was not yet one of integration and told him that I had two hundred employees and half of them were colored. I thought as much of them as I did the white employees. I invited them back in my kitchen if they'd like to go back and talk to them. I wanted to prove to them it wasn't my policy, my personal prejudice, we were not, that I had valuable colored employees and I thought just as much of them. I tried to reason with these leaders, told them that as long as my customers were deciding who they wanted to eat with, I'm at the mercy of my customers. I'm trying to do what they want. If they fail to come in, these people are not paying my expenses, and my bills. They didn't want to go back and talk to my colored employees because every one of them are in sympathy with me and that is we're in sympathy with what their objectives are, with what they are trying to abolish . . . ."

The Maryland Court of Appeals affirmed the convictions, rejecting petitioners' contentions urged in both courts that Maryland had (1) denied them equal protection and due process under the Fourteenth Amendment by applying its trespass statute to enforce the restaurant owner's policy and practice of racial discrimination, and (2) denied them freedom of expression guaranteed by the Constitution by punishing them for remaining at the restaurant, which they were doing as a protest against the owner's practice of refusing service to Negroes.[3] This case, *Barr* v. *City of Columbia, ante,* p. 146, and *Bouie* v. *City of Columbia, post,* p. 347, all raised these same two constitutional questions, which we granted certiorari to decide.[4] The Solicitor General has filed *amicus* briefs and participated in oral argument in these cases; while he joins in asking reversal of all the convictions, his arguments vary in significant respects from those of the petitioners. We would reject the contentions of the petitioners and of the Solicitor General in this case and affirm the judgment of the Maryland court.

## I.

On the same day that petitioners filed the petition for certiorari in this case, Baltimore enacted an ordinance forbidding privately owned restaurants to refuse to serve Negroes because of their color.[5] Nearly a year later Maryland, without repealing the state trespass law petitioners violated, passed a law applicable to Baltimore and some other localities making such discrimination by res-

---

[3] 227 Md. 302, 176 A. 2d 771 (1962).

[4] 374 U. S. 804, 805 (1963). Probable jurisdiction was noted in *Robinson* v. *Florida,* 374 U. S. 803 (1963), rev'd, *ante,* p. 153. Certiorari had already been granted in *Griffin* v. *Maryland,* 370 U. S. 935 (1962), rev'd, *ante,* p. 130.

[5] Ordinance No. 1249, June 8, 1962, adding § 10A to Art. 14A, Baltimore City Code (1950 ed.).

taurant owners unlawful.[6]  We agree that the general
judicial rule or practice in Maryland and elsewhere, as
pointed out in the Court's opinion, is that a new statute
repealing an old criminal law will, in the absence of a
general or special saving clause, be interpreted as barring
pending prosecutions under the old law.  Although Mary-
land long has had a general saving clause clearly declar-
ing that prosecutions brought under a subsequently re-
pealed statute shall not be barred, the Court advances
many arguments why the Maryland Court of Appeals
could and perhaps would, so the Court says, hold that the
new ordinance and statute nevertheless bar these prosecu-
tions.  On the premise that the Maryland court might
hold this way and because we could thereby avoid passing
upon the constitutionality of the State's trespass laws, the
Court, without deciding the crucial constitutional ques-
tions which brought this case here, instead sends the case
back to the state court to consider the effect of the new
ordinance and statute.

We agree that this Court has power, with or without
deciding the constitutional questions, to remand the case
for the Maryland Court of Appeals to decide the state
question as to whether the convictions should be set aside
and the prosecutions abated because of the new laws.
But as the cases cited by the Court recognize, our ques-
tion is not one of power to take this action but of whether
we should.  And the Maryland court would be equally
free to give petitioners the benefit of any rights they
have growing out of the new law whether we upheld the
trespass statute and affirmed, or refused to pass upon its
validity at this time.  For of course our affirmance of
the state court's holding that the Maryland trespass

---

[6] Md. Acts 1963, c. 227, Art. 49B Md. Code § 11 (enacted March 29,
1963, effective June 1, 1963).  A later accommodations law, of state-
wide coverage, was enacted, Md. Acts 1964, Sp. Sess., c. 29, § 1, but
will not take effect unless approved by referendum.

statute is constitutional as applied would in no way hamper or bar decision of further state questions which the Maryland court might deem relevant to protect the rights of the petitioners in accord with Maryland law. Recognition of this power of state courts after we affirm their holdings on federal questions is a commonplace occurrence. See, *e. g., Piza Hermanos* v. *Caldentey,* 231 U. S. 690, 692 (1914); *Fidelity Ins. Trust & Safe Deposit Co.* v. *McClain,* 178 U. S. 113, 114 (1900).

Nor do we agree that because of the new state question we should vacate the judgment in order to avoid deciding the constitutionality of the trespass statute as applied. We fully recognize the salutary general judicial practice of not unnecessarily reaching out to decide constitutional questions. But this is neither a constitutional nor a statutory requirement. Nor does the principle properly understood and applied impose a rigid, arbitrary, and inexorable command that courts should never decide a constitutional question in any single case if subtle ingenuity can think up any conceivable technique that might, if utilized, offer a distant possibility of avoiding decision. Here we believe the constitutionality of this trespass statute should be decided.

This case is but one of five involving the same kind of sit-in trespass problems we selected out of a large and growing group of pending cases to decide this very question. We have today granted certiorari in two more of this group of cases.[7] We know that many similar cases are now on the way and that many others are bound to follow. We

---

[7] *Hamm* v. *City of Rock Hill,* 377 U. S. 988; *Lupper* v. *Arkansas,* 377 U. S. 989. The same question was presented but is not decided in seven other cases which the Court today disposes of in various ways. See *Drews* v. *Maryland, post,* p. 547; *Williams* v. *North Carolina, post,* p. 548; *Fox* v. *North Carolina, post,* p. 587; *Mitchell* v. *City of Charleston, post,* p. 551; *Ford* v. *Tennessee,* 377 U. S. 994; *Green* v. *Virginia, post,* p. 550; *Harris* v. *Virginia, post,* p. 552.

know, as do all others, that the conditions and feelings that brought on these demonstrations still exist and that rights of private property owners on the one hand and demonstrators on the other largely depend at this time on whether state trespass laws can constitutionally be applied under these circumstances. Since this question is, as we have pointed out, squarely presented in this very case and is involved in other cases pending here and others bound to come, we think it is wholly unfair to demonstrators and property owners alike as well as against the public interest not to decide it now. Since *Marbury* v. *Madison,* 1 Cranch 137 (1803), it has been this Court's recognized responsibility and duty to decide constitutional questions properly and necessarily before it. That case and others have stressed the duty of judges to act with the greatest caution before frustrating legislation by striking it down as unconstitutional. We should feel constrained to decide this question even if we thought the state law invalid. In this case, however, we believe that the state law is a valid exercise of state legislative power, that the question is properly before us, and that the national interest imperatively calls for an authoritative decision of the question by this Court. Under these circumstances we think that it would be an unjustified abdication of our duty to leave the question undiscussed. This we are not willing to do. So we proceed to state our views on the merits of the constitutional challenges to the Maryland law.

## II.

Although the question was neither raised nor decided in the courts below, petitioners contend that the Maryland statute is void for vagueness under the Due Process Clause of the Fourteenth Amendment because its language gave no fair warning that "sit-ins" staged over a restaurant owner's protest were prohibited by the statute.

The challenged statutory language makes it an offense for any person to "enter upon or cross over the land, premises or private property of any person or persons in this State after having been duly notified by the owner or his agent not to do so . . . ." Petitioners say that this language plainly means that an entry upon another's property is an offense only if the owner's notice has been given before the intruder is physically on the property; that the notice to petitioners that they were not wanted was given only after they had stepped from the street into the restaurant; and that the statute as applied to them was void either because (1) there was no evidence to support the charge of entry *after* notice not to do so, or because (2) the statute failed to warn that it could be violated by remaining on property after having been told to leave. As to (1), in view of the evidence and petitioners' statements at the trial it is hard to take seriously a contention that petitioners were not fully aware, before they ever entered the restaurant, that it was the restaurant owner's firmly established policy and practice not to serve Negroes. The whole purpose of the "sit-in" was to protest that policy. (2) Be that as it may, the Court of Appeals of Maryland held that "the statutory references to 'entry upon or crossing over,' cover the case of remaining upon land after notice to leave," and the trial court found, with very strong evidentiary support, that after unequivocal notice to petitioners that they would not be seated or served they "persisted in their demands and, brushing by the hostess, took seats at various tables on the main floor and at the counter in the basement." We are unable to say that holding this conduct barred by the Maryland statute was an unreasonable interpretation of the statute or one which could have deceived or even surprised petitioners or others who

wanted to understand and obey it. It would certainly be stretching the rule against ambiguous statutes very far indeed to hold that the statutory language misled these petitioners as to the Act's meaning, in the face of evidence showing a prior series of demonstrations by Negroes, including some of petitioners, and in view of the fact that the group which included petitioners came prepared to picket Hooper and actually courted arrest, the better to protest his refusal to serve colored people.

We reject the contention that the statute as construed is void for vagueness. In doing so, we do not overlook or disregard the view expressed in other cases that statutes which, in regulating conduct, may indirectly touch the areas of freedom of expression should be construed narrowly where necessary to protect that freedom.[8] And we do not doubt that one purpose of these "sit-ins" was to express a vigorous protest against Hooper's policy of not serving Negroes.[9] But it is wholly clear that the Maryland statute here is directed not against what petitioners said but against what they did—remaining on the premises of another after having been warned to leave, conduct which States have traditionally prohibited in this country.[10] And none of our prior cases has held that a person's right to freedom of expression carries with it a right to force a private property owner to furnish his property as a platform to criticize the property owner's use of that property. Cf. *Giboney* v. *Empire Storage & Ice Co.,* 336 U. S. 490 (1949). We believe that the statute as construed and applied is not void for vagueness.

---

[8] *Winters* v. *New York,* 333 U. S. 507, 512 (1948); *Cantwell* v. *Connecticut,* 310 U. S. 296, 307–308 (1940).

[9] See *Garner* v. *Louisiana,* 368 U. S. 157, 185 (1961) (HARLAN, J., concurring).

[10] See *Martin* v. *City of Struthers,* 319 U. S. 141, 147 and n. 10 (1943).

## III.

Section 1 of the Fourteenth Amendment provides in part:

"No State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

This section of the Amendment, unlike other sections,[11] is a prohibition against certain conduct only when done by a State—"state action" as it has come to be known— and "erects no shield against merely private conduct, however discriminatory or wrongful." *Shelley* v. *Kraemer*, 334 U. S. 1, 13 (1948).[12] This well-established interpretation of section 1 of the Amendment—which all the parties here, including the petitioners and the Solicitor General, accept—means that this section of the Amendment does not of itself, standing alone, in the absence of some cooperative state action or compulsion,[13] forbid property holders, including restaurant owners, to ban people from entering or remaining upon their premises, even if the owners act out of racial prejudice. But "the prohibitions of the amendment extend to all action of the State denying equal protection of the laws" whether "by its legislative, its executive, or its judicial authorities." *Virginia* v. *Rives*, 100 U. S. 313, 318 (1880). The Amendment thus forbids all kinds of state action, by all state agencies and officers, that dis-

---

[11] *E. g.*, § 5: "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."

[12] Citing *Civil Rights Cases*, 109 U. S. 3 (1883); *United States* v. *Harris*, 106 U. S. 629 (1883); *United States* v. *Cruikshank*, 92 U. S. 542 (1876).

[13] See *Burton* v. *Wilmington Parking Authority*, 365 U. S. 715 (1961).

criminate against persons on account of their race.[14] It was this kind of state action that was held invalid in *Brown* v. *Board of Education,* 347 U. S. 483 (1954), *Peterson* v. *City of Greenville,* 373 U. S. 244 (1963), *Lombard* v. *Louisiana,* 373 U. S. 267 (1963), and *Griffin* v. *County School Board,* 377 U. S. 218 (1964), and that this Court today holds invalid in *Robinson* v. *Florida, ante,* p. 153.

Petitioners, but not the Solicitor General, contend that their conviction for trespass under the state statute was by itself the kind of discriminatory state action forbidden by the Fourteenth Amendment. This contention, on its face, has plausibility when considered along with general statements to the effect that under the Amendment forbidden "state action" may be that of the Judicial as well as of the Legislative or Executive Branch of Government. But a mechanical application of the Fourteenth Amendment to this case cannot survive analysis. The Amendment does not forbid a State to prosecute for crimes committed against a person or his property, however prejudiced or narrow the victim's views may be. Nor can whatever prejudice and bigotry the victim of a crime may have be automatically attributed to the State that prosecutes. Such a doctrine would not only be based on a fiction; it would also severely handicap a State's efforts to maintain a peaceful and orderly society. Our society has put its trust in a system of criminal laws to punish lawless conduct. To avert personal feuds and violent brawls it has led its people to believe and expect that wrongs against them will be vindicated in the courts. Instead of attempting to take the law into their own hands, people have been taught to call for police protection to protect their rights wherever possible.[15] It would

---

[14] See *Shelley* v. *Kraemer, supra,* 334 U. S., at 14–15 (1948), particularly notes 13 and 14.

[15] The use in this country of trespass laws, both civil and criminal, to allow people to substitute the processes of the law for force and

betray our whole plan for a tranquil and orderly society to say that a citizen, because of his personal prejudices, habits, attitudes, or beliefs, is cast outside the law's protection and cannot call for the aid of officers sworn to uphold the law and preserve the peace. The worst citizen no less than the best is entitled to equal protection of the laws of his State and of his Nation. None of our past cases justifies reading the Fourteenth Amendment in a way that might well penalize citizens who are law-abiding enough to call upon the law and its officers for protection instead of using their own physical strength or dangerous weapons to preserve their rights.

In contending that the State's prosecution of petitioners for trespass is state action forbidden by the Fourteenth Amendment, petitioners rely chiefly on *Shelley* v. *Kraemer, supra.* That reliance is misplaced. *Shelley* held that the Fourteenth Amendment was violated by a State's enforcement of restrictive covenants providing that certain pieces of real estate should not be used or occupied by Negroes, Orientals, or any other non-Caucasians, either as owners or tenants, and that in case of use or occupancy by such proscribed classes, the title of any person so using or occupying it should be divested. Many briefs were filed in that case by the parties and by *amici curiae.* To support the holding that state

violence has an ancient origin in England. Land law was once bound up with the notion of "seisin," a term connoting "peace and quiet." 2 Pollock and Maitland, The History of English Law Before the Time of Edward I (2d ed. 1909), 29, 30. As Coke put it, "he who is in possession may sit down in rest and quiet . . . ." 6 Co. Rep. 57b. To vindicate this right to undisturbed use and enjoyment of one's property, the law of trespass came into being. The leading historians of the early English law have observed the constant interplay between "our law of possession and trespass" and have concluded that since "to allow men to make forcible entries on land . . . is to invite violence," the trespass laws' protection of possession "is a prohibition of self-help in the interest of public order." 2 Pollock and Maitland, *supra,* at 31, 41.

enforcement of the agreements constituted prohibited state action even though the agreements were made by private persons to whom, if they act alone, the Amendment does not apply, two chief grounds were urged: (1) This type of agreement constituted a restraint on alienation of property, sometimes in perpetuity, which, if valid, was in reality the equivalent of and had the effect of state and municipal zoning laws, accomplishing the same kind of racial discrimination as if the State had passed a statute instead of leaving this objective to be accomplished by a system of private contracts, enforced by the State. See *Marsh* v. *Alabama,* 326 U. S. 501 (1946); *Terry* v. *Adams,* 345 U. S. 461 (1953); cf. *Yick Wo* v. *Hopkins,* 118 U. S. 356 (1886); *Nashville, C. & St. L. R. Co.* v. *Browning,* 310 U. S. 362 (1940).[16] (2) Nearly all the briefs in *Shelley* which asked invalidation of the restrictive covenants iterated and reiterated that judicial enforcement of this system of covenants was forbidden state action because the right of a citizen to own, use, enjoy, occupy, and dispose of property is a federal right protected by the Civil Rights Acts of 1866 and 1870, validly passed pursuant to congressional power authorized by section 5 of the Fourteenth Amendment.[17] This

[16] On this subject the Solicitor General in his brief says: "The series of covenants becomes in effect a local zoning ordinance binding those in the area subject to the restriction without their consent. Cf. *Buchanan* v. *Warley,* 245 U. S. 60. Where the State has delegated to private persons a power so similar to law-making authority, its exercise may fairly be held subject to constitutional restrictions."

[17] 42 U. S. C. § 1982, deriving from 14 Stat. 27, § 1 (1866), provides: "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U. S. C. § 1981, deriving from 16 Stat. 144, § 16 (1870), provides: "All persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . . ." The constitutionality of these statutes was recognized in *Virginia* v. *Rives,* 100 U. S. 313, 317–318 (1880), and in *Buchanan* v. *Warley,* 245 U. S. 60, 79–80 (1917).

argument was buttressed by citation of many cases, some of which are referred to in this Court's opinion in *Buchanan* v. *Warley,* 245 U. S. 60 (1917). In that case this Court, acting under the Fourteenth Amendment and the Civil Rights Acts of 1866 and 1870, struck down a city ordinance which zoned property on the basis of race, stating, 245 U. S., at 81, "The right which the ordinance annulled was the civil right of a white man to dispose of his property if he saw fit to do so to a person of color and of a colored person to make such disposition to a white person." *Buchanan* v. *Warley* was heavily relied on by this Court in *Shelley* v. *Kraemer, supra,* where this statement from *Buchanan* was quoted: "The Fourteenth Amendment and these statutes [of 1866 and 1870] enacted in furtherance of its purpose operate to qualify and entitle a colored man to acquire property without state legislation discriminating against him solely because of color." 334 U. S., at 11–12. And the Court in *Shelley* went on to cite with approval two later decisions of this Court which, relying on *Buchanan* v. *Warley,* had invalidated other city ordinances.[18]

It seems pretty clear that the reason judicial enforcement of the restrictive covenants in *Shelley* was deemed state action was not merely the fact that a state court had acted, but rather that it had acted "to deny to petitioners, on the grounds of race or color, the enjoyment of property rights in premises which petitioners are willing and financially able to acquire and which the grantors are willing to sell." 334 U. S., at 19. In other words, this Court held that state enforcement of the covenants had the effect of denying to the parties their federally guaranteed right to own, occupy, enjoy, and use their property without regard to race or color. Thus, the line of cases from *Buchanan* through *Shelley* establishes these

---

[18] *Harmon* v. *Tyler,* 273 U. S. 668 (1927); *Richmond* v. *Deans,* 281 U. S. 704 (1930).

propositions: (1) When an owner of property is willing to sell and a would-be purchaser is willing to buy, then the Civil Rights Act of 1866, which gives all persons the same right to "inherit, purchase, lease, sell, hold, and convey" property, prohibits a State, whether through its legislature, executive, or judiciary, from preventing the sale on the grounds of the race or color of one of the parties. *Shelley* v. *Kraemer, supra,* 334 U. S., at 19. (2) Once a person has become a property owner, then he acquires all the rights that go with ownership: "the free use, enjoyment, and disposal of a person's acquisitions without control or diminution save by the law of the land." *Buchanan* v. *Warley, supra,* 245 U. S., at 74. This means that the property owner may, in the absence of a valid statute forbidding it, sell his property to whom he pleases and admit to that property whom he will; so long as *both* parties are willing parties, then the principles stated in *Buchanan* and *Shelley* protect this right. But equally, when one party is unwilling, as when the property owner chooses *not* to sell to a particular person or *not* to admit that person, then, as this Court emphasized in *Buchanan,* he is entitled to rely on the guarantee of due process of law, that is, "law of the land," to protect his free use and enjoyment of property and to know that only by valid legislation, passed pursuant to some constitutional grant of power, can anyone disturb this free use. But petitioners here would have us hold that, despite the absence of any valid statute restricting the use of his property, the owner of Hooper's restaurant in Baltimore must not be accorded the same federally guaranteed right to occupy, enjoy, and use property given to the parties in *Buchanan* and *Shelley;* instead, petitioners would have us say that Hooper's federal right must be cut down and he must be compelled—though no statute said he must—to allow people to force their way into his restaurant and remain there over his protest. We cannot subscribe to

such a mutilating, one-sided interpretation of federal guarantees the very heart of which is equal treatment under law to all. We must never forget that the Fourteenth Amendment protects "life, liberty, or property" of all people generally, not just some people's "life," some people's "liberty," and some kinds of "property."

In concluding that mere judicial enforcement of the trespass law is not sufficient to impute to Maryland Hooper's refusal to serve Negroes, we are in accord with the Solicitor General's views as we understand them. He takes it for granted

"that the mere fact of State intervention through the courts or other public authority in order to provide sanctions for a private decision is not enough to implicate the State for the purposes of the Fourteenth Amendment. . . . Where the only State involvement is color-blind support for every property-owner's exercise of the normal right to choose his business visitors or social guests, proof that the particular property-owner was motivated by racial or religious prejudice is not enough to convict the State of denying equal protection of the laws."

The Solicitor General also says:

"The preservation of a free and pluralistic society would seem to require substantial freedom for private choice in social, business and professional associations. Freedom of choice means the liberty to be wrong as well as right, to be mean as well as noble, to be vicious as well as kind. And even if that view were questioned, the philosophy of federalism leaves an area for choice to the States and their people, when the State is not otherwise involved, instead of vesting the only power of effective decision in the federal courts."

We, like the Solicitor General, reject the argument that the State's protection of Hooper's desire to choose customers on the basis of race by prosecuting trespassers is enough, standing alone, to deprive Hooper of his right to operate the property in his own way. But we disagree with the contention that there are other circumstances which, added to the State's prosecution for trespass, justify a finding of state action. There is no Maryland law, no municipal ordinance, and no official proclamation or action of any kind that shows the slightest state coercion of, or encouragement to, Hooper to bar Negroes from his restaurant.[19] Neither the State, the city, nor any of their agencies has leased publicly owned property to Hooper.[20] It is true that the State and city regulate the restaurants—but not by compelling restaurants to deny service to customers because of their race. License fees are collected, but this licensing has no relationship to race. Under such circumstances, to hold that a State must be held to have participated in prejudicial conduct of its licensees is too big a jump for us to take. Businesses owned by private persons do not become agencies of the State because they are licensed; to hold that they do would be completely to negate all our private ownership concepts and practices.

Neither the parties nor the Solicitor General, at least with respect to Maryland, has been able to find the present existence of any state law or local ordinance, any state court or administrative ruling, or any other official state conduct which could possibly have had any coercive influence on Hooper's racial practices. Yet despite a complete absence of any sort of proof or even respectable

---

[19] Compare *Robinson* v. *Florida, ante,* p. 153; *Peterson* v. *City of Greenville,* 373 U. S. 244 (1963); *Lombard* v. *Louisiana,* 373 U. S. 267 (1963).

[20] Compare *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715 (1961).

speculation that Maryland in any way instigated or encouraged Hooper's refusal to serve Negroes, it is argued at length that Hooper's practice should be classified as "state action." This contention rests on a long narrative of historical events, both before and since the Civil War, to show that in Maryland, and indeed in the whole South, state laws and state actions have been a part of a pattern of racial segregation in the conduct of business, social, religious, and other activities. This pattern of segregation hardly needs historical references to prove it. The argument is made that the trespass conviction should be labeled "state action" because the "momentum" of Maryland's "past legislation" is still substantial in the realm of public accommodations. To that extent, the Solicitor General argues, "a State which has drawn a color line may not suddenly assert that it is color blind." We cannot accept such an *ex post facto* argument to hold the application here of Maryland's trespass law unconstitutional. Nor can we appreciate the fairness or justice of holding the present generation of Marylanders responsible for what their ancestors did in other days [21]—even if we had the right to substitute our own ideas of what the Fourteenth Amendment ought to be for what it was written and adopted to achieve.

There is another objection to accepting this argument. If it were accepted, we would have one Fourteenth Amendment for the South and quite a different and more lenient one for the other parts of the country. Present "state action" in this area of constitutional rights would

---

[21] In fact, as pointed out in Part I of this opinion, Maryland has recently passed a law prohibiting racial discrimination in restaurants in Baltimore and some other parts of the State, and Baltimore has enacted a similar ordinance. Still another Maryland antidiscrimination law, of statewide application, has been enacted but is subject to referendum. See note 6, *supra*.

be governed by past history in the South—by present conduct in the North and West. Our Constitution was not written to be read that way, and we will not do it.

## IV.

Our Brother GOLDBERG in his opinion argues that the Fourteenth Amendment, of its own force and without the need of congressional legislation, prohibits privately owned restaurants from discriminating on account of color or race. His argument runs something like this: (1) Congress understood the "Anglo-American" common law, as it then existed in the several States, to prohibit owners of inns and other establishments open to the public from discriminating on account of race; (2) in passing the Civil Rights Act of 1866 and other civil rights legislation, Congress meant access to such establishments to be among the "civil rights" protected; (3) finally, those who framed and passed the Fourteenth Amendment intended it, of its own force, to assure persons of all races equal access to privately owned inns and other accommodations. In making this argument, the opinion refers us to three state supreme court cases and to congressional debates on various post-Civil War civil rights bills. However, not only does the very material cited furnish scant, and often contradictory, support for the first two propositions (about the common law and the Reconstruction era statutes), but, even more important, the material furnishes absolutely none for the third proposition, which is the issue in this case.

In the first place, there was considerable doubt and argument concerning what the common law in the 1860's required even of carriers and innkeepers and still more concerning what it required of owners of other establishments. For example, in Senate debates in 1864 on a proposal to amend the charter of the street railway company in the District of Columbia to prohibit it from excluding

any person from its cars on account of color—a debate cited in Mr. Justice Goldberg's opinion—one Senator thought that the common law would give a remedy to any Negro excluded from a street car,[22] while another argued that "it was universally conceded that railroad companies, steamboat proprietors, coach lines, had the right to make this regulation" requiring Negroes to ride in separate cars.[23] Senator Sumner of Massachusetts, one of the chief proponents of legislation of this type, admitted that there was "doubt" both as to what the street railway's existing charter required and as to what the common law required; therefore he proposed that, since the common law had "fallen into disuse" or "become disputable," Congress should act: "[L]et the rights of colored persons be placed under the protection of positive statute . . . ."[24]

Second, it is not at all clear that in the statutes relied on—the Civil Rights Act of 1866 and the Supplementary Freedmen's Bureau Act—Congress meant for those statutes to guarantee Negroes access to estab-

---

[22] Cong. Globe, 38th Cong., 1st Sess., 1159 (1864) (Senator Morrill).

[23] Id., at 1157–1158 (Senator Saulsbury).

[24] Id., at 1158. In response to a question put by Senator Carlile of Virginia, Sumner stated that it had taken a statute to assure Negroes equal treatment in Massachusetts:

"That whole question, after much discussion in Massachusetts, has been settled by *legislation*, and the rights of every colored person are placed on an equality with those of white persons. They have the same right with white persons to ride in every public conveyance in the Commonwealth. *It was done by positive legislation* twenty-one years ago." *Ibid.* (Emphasis supplied.)

A few minutes later, Senator Davis of Kentucky asked Sumner directly if it was not true that what treatment was extended to colored people by "public hotels" incorporated by the Commonwealth of Massachusetts was left to "the judgment and discretion of the proprietors and managers of the hotels." Sumner, who had answered immediately preceding statements by Davis, left this one unchallenged. *Id.*, at 1161.

lishments otherwise open to the general public.[25] For example, in the House debates on the Civil Rights bill of 1866 cited, not one of the speakers mentioned privately owned accommodations.[26] Neither the text of the bill,[27]

[25] A number of the remarks quoted as having been made in relation to Negroes' access to privately owned accommodations in fact dealt with other questions altogether. For example, Senator Trumbull of Illinois is quoted, *ante*, p. 293, as having said that the Negro should have the right "to go where he pleases." It is implied that such remarks cast light on the question of access to privately owned accommodations. In fact, the statement, made in the course of a debate on a bill (S. 60) to enlarge the powers of the Freedmen's Bureau, related solely to Black Laws that had been enacted in some of the Southern States. Trumbull attacked the "slave codes" which "prevented the colored man going from home," and he urged that Congress nullify all laws which would not permit the colored man "to go where he pleases." Cong. Globe, 39th Cong., 1st Sess., 322 (1866). Similarly, in another debate, on a bill (S. 9) for the protection of freedmen, Senator Wilson of Massachusetts had just told the Senate about such laws as that of Mississippi which provided that any freedman who quit his job "without good cause" during the term of his employment should, upon affidavit of the employer, be arrested and carried back to the employer. Speaking of such relics of slavery, Wilson said that freedmen were "as free as I am, to work when they please, to play when they please, to go where they please . . . ." *Id.*, at 41. Senator Trumbull then joined the debate, wondering if S. 9 went far enough and saying that to prevent States "from enslaving, under any pretense," the freedmen, he might introduce his own bill to ensure the right of freedmen to "go and come when they please." *Id.*, at 43. It was to the Black Laws—and not anything remotely to do with accommodations—that Wilson, Trumbull, and others addressed their statements. Moreover, in the debate on S. 9, Senator Trumbull expressly referred to the Thirteenth Amendment as the constitutional basis both for the pending bill and for his own bill, *ibid.*, showing that the Senate's concern was with state laws restricting the movement of, and in effect re-enslaving, colored people.

[26] Cong. Globe, 39th Cong., 1st Sess., 474–476 (1866) (Trumbull of Illinois), 599 (Trumbull), 606 (Trumbull), 1117 (Wilson of Iowa), 1151 (Thayer of Pennsylvania), 1154 (Thayer), 1157 (Thornton of Minnesota), 1159 (Windom of Minnesota).

[27] See *id.*, at 211–212.

nor, for example, the enumeration by a leading supporter of the bill of what "civil rights" the bill would protect,[28] even mentioned inns or other such facilities. Hence we are pointed to nothing in the legislative history which gives rise to an inference that the proponents of the Civil Rights Act of 1866 meant to include as a "civil right" a right to demand service at a privately owned restaurant or other privately owned establishment. And, if the 1866 Act did impose a statutory duty on innkeepers and others, then it is strange indeed that Senator Sumner in 1872 thought that an Act of Congress was necessary to require hotels, carriers, theatres, and other places to receive all races,[29] and even more strange that Congress felt obliged in 1875 to pass the Civil Rights Act of that year explicitly prohibiting discrimination by inns, conveyances, theatres, and other places of public amusement.[30]

Finally, and controlling here, there is nothing whatever in the material cited to support the proposition that the Fourteenth Amendment, without congressional legislation, prohibits owners of restaurants and other places to refuse service to Negroes. We are cited, only in passing, to general statements made in the House of Representatives to the effect that the Fourteenth Amendment was meant to incorporate the "principles" of the Civil Rights Act of 1866.[31] Whether "principles" are the same thing as "provisions," we are not told. But we have noted the serious doubt that the Civil Rights Act of 1866 even dealt with access to privately owned facilities. And it is revealing that in not one of the passages cited from the debates on the Fourteenth Amendment did any speaker suggest that the Amendment was designed,

---

[28] *Id.*, at 1151 (Thayer).

[29] Cong. Globe, 42d Cong., 2d Sess., 381–383 (1872).

[30] 18 Stat. 335.

[31] Cong. Globe, 39th Cong., 1st Sess., 2459, 2462, 2465, 2467, 2538 (1866).

of itself, to assure all races equal treatment at inns and other privately owned establishments.

Apart from the one passing reference just mentioned above to the debates on the Fourteenth Amendment, a reference which we have shown had no relevance whatever to whom restaurants should serve, every one of the passages cited deals entirely with proposed *legislation*—not with the Amendment.[32]   It should be obvious that what may have been proposed in connection with passage of one statute or another is altogether irrelevant to the question of what the Fourteenth Amendment does in the absence of legislation.   It is interesting to note that in 1872, some years after the passage of the Fourteenth Amendment, Senator Sumner, always an indefatigable proponent of statutes of this kind, proposed in a debate to which we are cited a bill to give all citizens, regardless of color, equal enjoyment of carriers, hotels, theatres, and certain other places.   He submitted that, as to hotels and carriers (but not as to theatres and places of amusement), the bill "simply reenforce[d]" the common law;[33] it is

---

[32] Cong. Globe, 38th Cong., 1st Sess., 839 (1864) (debate on bill to repeal law prohibiting colored persons from carrying the mail); Cong. Globe, 38th Cong., 1st Sess., 1156–1157 (1864) (debate on amending the charter of the Metropolitan Railroad Co.); Cong. Globe, 39th Cong., 1st Sess., 322, 541, 916, 936 (1866) (debate on bill to amend the Freedmen's Bureau Act, S. 60); Cong. Globe, 39th Cong., 1st Sess., 474–476, 599, 606, 1117–1118, 1151, 1154, 1157, 1159, 1263 (1866) (debate on the Civil Rights Act of 1866, S. 61); Cong. Globe, 39th Cong., 1st Sess., 41, 111 (1866) (debate on bill for the protection of freedmen from Black Codes, S. 9); Cong. Globe, 42d Cong., 2d Sess., 381–383 (1872) (debate on Sumner's amendment to bill removing political and civil disabilities on ex-Confederates, H. R. 380); 2 Cong. Rec. 4081–4082 (1874) (debate on bill to give all citizens equal enjoyment of inns, etc., S. 1).   One cited passage, Cong. Globe, 39th Cong., 1st Sess., 684 (1866), consists of remarks made in debate on a proposed constitutional amendment having to do with apportionment of representation, H. R. 51.

[33] Cong. Globe, 42d Cong., 2d Sess., 383 (1872).

significant that he did not argue that the bill would en-
force a right already protected by the Fourteenth Amend-
ment itself—the stronger argument, had it been available
to him.   Similarly, in an 1874 debate on a bill to give all
citizens, regardless of color, equal enjoyment of inns, pub-
lic conveyances, theatres, places of public amusement,
common schools, and cemeteries (a debate also cited),
Senator Pratt argued that the bill gave the same rights
as the common law but would be a more effective rem-
edy.[34]   Again, it is significant that, like Sumner in the
1872 debates, Pratt suggested as precedent for the bill
only his belief that the common law required equal
treatment; he never intimated that the Fourteenth
Amendment laid down such a requirement.

We have confined ourselves entirely to those debates
cited in Brother GOLDBERG's opinion the better to show
how, even on its own evidence, the opinion's argument
that the Fourteenth Amendment without more prohibits
discrimination by restaurants and other such places rests
on a wholly inadequate historical foundation.   When
read and analyzed, the argument is shown to rest entirely
on what speakers are said to have believed bills and
statutes of the time were meant to do.   Such proof fails
entirely when the question is, not what statutes did,
but rather what the Constitution does.   Nor are the three
state cases [35] relied on any better evidence, for all three

---

[34] 2 Cong. Rec. 4081 (1874).

[35] *Donnell* v. *State,* 48 Miss. 661 (1873); *Coger* v. *North West.
Packet Co.,* 37 Iowa 145 (1873); *Ferguson* v. *Gies,* 82 Mich. 358,
46 N. W. 718 (1890).   The Mississippi case does contain this observa-
tion pertinent to a court's duty to confine itself to deciding cases and
interpreting constitutions and statutes and to leave the legislating to
legislatures:

"Events of such vast magnitude and influence now and hereafter,
have gone into history within the last ten years, that the public mind
is not yet quite prepared to consider them calmly and dispas[s]ion-
ately.   To the judiciary, which ought at all times to be calm, delib-

dealt with state antidiscrimination statutes; not one purported to interpret the Fourteenth Amendment.[36]  And, if we are to speak of cases decided at that time, we should recall that this Court, composed of Justices appointed by Presidents Lincoln, Grant, Hayes, Garfield, and Arthur, held in a series of constitutional interpretations beginning with the *Slaughter-House Cases*, 16 Wall. 36 (1873), that the Amendment of itself was directed at state action only and that it did not displace the power of the state and federal legislative bodies to regulate the affairs of privately owned businesses.[37]

We are admonished that in deciding this case we should remember that "it is *a constitution* we are ex-

---

erate and firm, especially so when the public thought and sentiment are at all excited beyond the normal tone, is committed the high trust of declaring what are the rules of conduct and propriety prescribed by the supreme authority, and what are the rights of individuals under them.  As to the policy of legislation, the judiciary have nothing to do.  That is wisely left with the law-making department of the government."  48 Miss., at 675.

[36] The Attorney General of Mississippi is quoted as having argued in *Donnell* v. *State,* 48 Miss. 661 (1873), that the Mississippi Legislature had "sought, by this [antidiscrimination] act, to render any interference by congress unnecessary."  *Ante,* p. 307, n. 25.  This very statement shows that the Mississippi Attorney General thought in 1873, as we believe today, that the Fourteenth Amendment did not of itself guarantee access to privately owned facilities and that it took legislation, such as that of Mississippi, to guarantee such access.

[37] Brother GOLDBERG's opinion in this case relies on *Munn* v. *Illinois,* 94 U. S. 113 (1877), which discussed the common-law rule that "when private property is devoted to a public use, it is subject to public regulation."  *Id.,* at 130.  This statement in *Munn* related, of course, to the extent to which a legislature constitutionally can regulate private property.  *Munn* therefore is not remotely relevant here, for in this case the problem is, not what legislatures can do, but rather what the Constitution itself does.  And in fact this Court some years ago rejected the notion that a State must depend upon some rationalization such as "affected with a public interest" in order for legislatures to regulate private businesses.  See *Nebbia* v. *New York,* 291 U. S. 502 (1934).

pounding." [38]   We conclude as we do because we remember that it *is* a Constitution and that it is our duty "to bow with respectful submission to its provisions." [39]   And in recalling that it is a Constitution "intended to endure for ages to come," [40] we also remember that the Founders wisely provided the means for that endurance: changes in the Constitution, when thought necessary, are to be proposed by Congress or conventions and ratified by the States.   The Founders gave no such amending power to this Court.   Cf. *Ex parte Virginia,* 100 U. S. 339, 345–346 (1880).   Our duty is simply to interpret the Constitution, and in doing so the test of constitutionality is not whether a law is offensive to our conscience or to the "good old common law," [41] but whether it is offensive to the Constitution.   Confining ourselves to our constitutional duty to construe, not to rewrite or amend, the Constitution, we believe that Section 1 of the Fourteenth Amendment does not bar Maryland from enforcing its trespass laws so long as it does so with impartiality.

This Court has done much in carrying out its solemn duty to protect people from unlawful discrimination. And it will, of course, continue to carry out this duty in the future as it has in the past.[42]   But the Fourteenth

----

[38] *McCulloch* v. *Maryland,* 4 Wheat. 316, 407 (1819).   (Emphasis in original.)

[39] *Cohens* v. *Virginia,* 6 Wheat. 264, 377 (1821).

[40] *McCulloch* v. *Maryland,* 4 Wheat. 316, 415 (1819).

[41] That the English common law was not thought altogether "good" in this country is suggested by the complaints of the Declaration of Independence, by the Virginia and Kentucky Resolutions, and by observations of Thomas Jefferson.   The Jeffersonian Cyclopedia 163 (Foley ed. 1900).

[42] It is said that our holding "does not do justice" to a Constitution which is color blind and to this Court's decision in *Brown* v. *Board of Education,* 347 U. S. 483 (1954).   *Ante,* pp. 287–288.   We agree, of course, that the Fourteenth Amendment is "color blind," in the sense that it outlaws all state laws which discriminate merely on

Amendment of itself does not compel either a black man or a white man running his own private business to trade with anyone else against his will. We do not believe that Section 1 of the Fourteenth Amendment was written or designed to interfere with a storekeeper's right to choose his customers or with a property owner's right to choose his social or business associates, so long as he does not run counter to valid state [43] or federal regulation. The case before us does not involve the power of the Congress to pass a law compelling privately owned businesses to refrain from discrimination on the basis of race and to trade with all if they trade with any. We express no views as to the power of Congress, acting under one or another provision of the Constitution, to prevent racial discrimination in the operation of privately owned businesses, nor upon any particular form of legislation to that end. Our sole conclusion is that Section 1 of the Fourteenth Amendment, standing alone, does not prohibit privately owned restaurants from choosing their own customers. It does not destroy what has until very recently been universally recognized in this country as the unchallenged right of a man who owns a business to run the business in his own way so long as some valid regulatory statute does not tell him to do otherwise.[44]

---

account of color. This was the basis upon which the Court struck down state laws requiring school segregation· in *Brown* v. *Board of Education, supra.* But there was no possible intimation in *Brown* or in any other of our past decisions that this Court would construe the Fourteenth Amendment as requiring restaurant owners to serve all races. Nor has there been any intimation that the Court should or would expand the Fourteenth Amendment because of a belief that it does not in our judgment go far enough.

[43] Cf. *Colorado Anti-Discrimination Comm'n* v. *Continental Air Lines, Inc.,* 372 U. S. 714 (1963).

[44] The opinion of our Brother GOLDBERG characterizes our argument as being that the Constitution "permits" Negroes to be denied access to restaurants on account of their color. We fear that this statement

344

## V.

Petitioners, but not the Solicitor General, contend that their convictions for trespass deny them the right of freedom of expression guaranteed by the Constitution. They argue that their

"expression (asking for service) was entirely appropriate to the time and place at which it occurred. They did not shout or obstruct the conduct of business. There were no speeches, picket signs, handbills or other forms of expression in the store possibly inappropriate to the time and place. Rather they offered to purchase food in a place and at a time set aside for such transactions. Their protest demonstration was a part of the 'free trade in ideas' (*Abrams* v. *United States,* 250 U. S. 616, 630, Holmes, J., dissenting) . . . ."

Their argument comes down to this: that since petitioners did not shout, obstruct Hooper's business (which the record refutes), make speeches, or display picket signs, handbills, or other means of communication, they had a perfect constitutional right to assemble and remain in the restaurant, over the owner's continuing objections, for the purpose of expressing themselves by language and "demonstrations" bespeaking their hostility to Hooper's refusal to serve Negroes. This Court's prior cases do not support such a privilege growing out of the constitutional rights of speech and assembly. Unquestionably peti-

---

might mislead some readers. Precisely put, our position is that the Constitution of itself does not prohibit discrimination by those who sell goods and services. There is of course a crucial difference between the argument—which we do make—that the Constitution itself does not prohibit private sellers of goods or services from choosing their own customers, and the argument—which we do not make—that the Constitution affirmatively creates a right to discriminate which neither state nor federal legislation could impair.

tioners had a constitutional right to express these views wherever they had an unquestioned legal right to be. Cf. *Marsh* v. *Alabama, supra.* But there is the rub in this case. The contention that petitioners had a constitutional right to enter or to stay on Hooper's premises against his will because, if there, they would have had a constitutional right to express their desire to have restaurant service over Hooper's protest, is a bootstrap argument. The right to freedom of expression is a right to express views—not a right to force other people to supply a platform or a pulpit. It is argued that this supposed constitutional right to invade other people's property would not mean that a man's home, his private club, or his church could be forcibly entered or used against his will—only his store or place of business which he has himself "opened to the public" by selling goods or services for money. In the first place, that argument assumes that Hooper's restaurant *had* been opened to the public. But the whole quarrel of petitioners with Hooper was that instead of being open to all, the restaurant refused service to Negroes. Furthermore, legislative bodies with power to act could of course draw lines like this, but if the Constitution itself fixes its own lines, as is argued, legislative bodies are powerless to change them, and homeowners, churches, private clubs, and other property owners would have to await case-by-case determination by this Court before they knew who had a constitutional right to trespass on their property. And even if the supposed constitutional right is confined to places where goods and services are offered for sale, it must be realized that such a constitutional rule would apply to all businesses and professions alike. A statute can be drafted to create such exceptions as legislators think wise, but a constitutional rule could as well be applied to the smallest business as to the largest, to the most personal professional relationship as to the most impersonal business,

to a family business conducted on a man's farm or in his home as to businesses carried on elsewhere.

A great purpose of freedom of speech and press is to provide a forum for settlement of acrimonious disputes peaceably, without resort to intimidation, force, or violence. The experience of ages points to the inexorable fact that people are frequently stirred to violence when property which the law recognizes as theirs is forcibly invaded or occupied by others. Trespass laws are born of this experience. They have been, and doubtless still are, important features of any government dedicated, as this country is, to a rule of law. Whatever power it may allow the States or grant to the Congress to regulate the use of private property, the Constitution does not confer upon any group the right to substitute rule by force for rule by law. Force leads to violence, violence to mob conflicts, and these to rule by the strongest groups with control of the most deadly weapons. Our Constitution, noble work of wise men, was designed—all of it—to chart a quite different course: to "establish Justice, insure domestic Tranquility . . . and secure the Blessings of Liberty to ourselves and our Posterity." At times the rule of law seems too slow to some for the settlement of their grievances. But it is the plan our Nation has chosen to preserve both "Liberty" and equality for all. On that plan we have put our trust and staked our future. This constitutional rule of law has served us well. Maryland's trespass law does not depart from it. Nor shall we.

We would affirm.